36 A.3d 567

In re R.I.S. & A.I.S.

Appeal of C.S., Father.

In The Interest of R.I.S. & A.I.S.

Appeal of C.S., Father.

Supreme Court of Pennsylvania.

Argued May 10, 2011.

Decided Nov. 23, 2011.

Traci Leigh McPate, for C.S., Father.

Martin Miller, York, for York County Children and Youth Services.

Edna M. Moore, York, for Guardian Ad Litem.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

JUSTICE McCAFFERY.

C.S. ("Father"), who is currently incarcerated in a State Correctional Institution in Erie County with a minimum release date in June 2012, and a maximum release date in June 2016, is the biological father of two minor children: A.I.S. (d.o.b. 7/5/07), and R.I.S. (d.o.b. 10/23/08) (collectively "the children"). He appeals the Superior Court's reversal of the York County trial court's orders denying petitions for the involuntary termination of his parental rights and for changes in the placement goals for the children from reunification to adoption. We reverse and take this opportunity to reiterate a principle that this Court has never abandoned: that a parent's incarceration, standing alone, cannot constitute proper grounds for the termination of his or her parental rights.

Father was sentenced to serve two to four years' incarceration in June 2008. In January 2009, York County Children and Youth Services ("CYS") filed an application for protective custody of the children, based in part on a request for emergency placement made by the biological mother of the children, K.H. ("Mother"). The children were adjudicated dependent in February 2009, and were placed together in a temporary foster home. A pre-adoptive resource was identified by CYS, and in December 2009, CYS filed petitions for changes in the placement goals for the children from reunifica-

tion to adoption, and for the involuntary termination of the parental rights of Father and Mother. On March 2, 2010, a hearing on the petitions was conducted.[1]

At the hearing, it was shown that a family service plan setting forth goals for Father with respect to reunification had been created in February 2009, and his progress toward attaining those goals was reviewed in July 2009 and again in December 2009. The goals set for Father included cooperating with service planning, signing necessary releases, remaining in contact with CYS through written correspondence, providing documentation upon completion of therapeutic prison programs, and maintaining a record of good prison conduct. Evidence was presented to show that Father had met each of these goals: he had cooperated with service planning, he had signed all necessary releases, he had remained in written and telephonic contact with CYS, he had provided CYS with documentation of his completion of therapeutic prison programs, and he had not had any incidents of misconduct while incarcerated.

Additionally, evidence was presented at the hearing that Father had maintained contact with the children by sending them cards on a monthly basis and by participating in a "Reading to Your Children" program sponsored by the prison whereby the children received a video of Father reading a book to them. It was shown that Father had requested visitation with the children, but the request was denied due to the time and distance that would be involved (an eleven-hour round trip by personal vehicle between the cities of York and Erie, Pennsylvania). Father's alternative request for "virtual visitation" was denied because CYS had no video-conferencing capability. It was further shown that Father purchased a pre-

1. By way of further background, the record reveals that Father and Mother were never married, but resided together as a family. At the time of Father's sentencing, Mother was pregnant with R.I.S., who was born after Father entered prison. At that time, Mother apparently relapsed into drug use, and CYS became involved. Mother also has a daughter, Z.B.S., whose biological father is unknown. Z.B.S. was taken into protective custody with R.I.S. and A.I.S., and all three are living together in the same foster home. There are no issues before us with respect to Z.B.S.

paid phone card and attempted several times to call the children, but the foster parents refused the calls.

The following testimony was elicited on cross-examination of Rachael Carey, a CYS family support caseworker, by Father's counsel:

Q. One of the other goals was for [Father] to refrain from negative behaviors while being incarcerated?

A. Yes.

Q. To your knowledge, [Father] has not had any incidents of misconduct while incarcerated?

A. Not to my knowledge.

Q. One of the goals also included remaining in contact with you via written correspondence?

A. Yes,

Q. And [Father] has remained in contact with you through letters?

A. Yes.

Q. And in those letters he has requested updates on the children?

A. Yes.

Q. He's asked about the[ir] welfare and their medical conditions?

A. Yes.

Q. He's also requested that you send pictures of the children?

A. Yes.

Q. And he's made a request on more than one occasion?

A. Yes.

Q. And did the agency forward photographs of the children to [Father]?

A. Yes.

Q. In addition to the written correspondence, you have also had several telephone conferences with [Father] at SCI Albion; correct?

A. Yes.

Q. Approximately how many phone calls have you had with [Father]?

A. Do you want me to count all of them or approximate?

Q. If you could approximate, that would be sufficient.

A. I would say five, maybe ten.

\* \* \*

Q. During the telephone conferences that you had with [Father], would he ask about the children?

A. Yes.

Q. And again, specifically, he would ask about their welfare and how they were doing in the foster home?

A. Yes.

Q. One of the goals listed is also that [Father] is to initiate supervised visitation with the children; correct?

A. Yes.

Q. And you've testified though, that was not able to happen because of the distance and the children's ages?

A. Yes.

Q. And again, that was not through any fault of [Father]?

A. It was not.

Q. Despite being incarcerated then, [Father] has still been consistent in his efforts to remain part of the children's lives; correct?

A. Yes.

Q. And he has not abandoned his concern for the welfare of the children?

A. No.

Q. He's remained interested in how they are doing?

A. Yes.

Q. Consistently asked for information about them and updates on their condition and progress?

A. Yes.

[Counsel]: One moment, your Honor. Nothing further.

[The Court]: To sum up your answer as to goals that were established, there was nothing that he didn't do or that

there wasn't some satisfactory reason for his not being able to do it?

[The Witness]: You're correct.

(Notes of Testimony Hearing, 3/2/10, at 43–46).

Following the hearing, the trial court entered orders denying the goal change petitions and the involuntary termination petitions with respect to Father.[2] It concluded that CYS had not proven any of the statutory bases for the involuntary termination of Father's rights, and characterized the CYS position as seeking termination based solely on the existence and length of Father's sentence of incarceration. CYS filed a timely appeal to the Superior Court.

The Superior Court reversed, but did so in a very divided ruling by a three-judge panel. The ruling was expressed by a single panelist, Judge Cheryl Lynn Allen, with one other, Judge Sallie Updyke Mundy, concurring in the result, while the third, Judge Robert E. Colville, dissented. The single judge who authored the memorandum opinion in which neither of her colleagues joined stated that "incarceration alone cannot constitute grounds for termination[,]" but nonetheless concluded that "Father's incarceration is evidence of his parental incapacity." Memorandum Opinion, dated 12/22/10, at 16–17. On that basis, the Superior Court determined that the trial court's conclusions were not supported by the record and that the trial court had committed an abuse of discretion. *Id.* at 18.

In his dissent, Judge Colville wrote:

The trial court found that Father has done everything possible for him to do regarding his responsibility as a father while incarcerated; the record included evidence that Father has maintained contact with and cooperated with CYS, has participated in hearings and meetings via telephone, has consistently requested information from CYS as to the welfare of the children, completed a program while

2. The court granted the petitions for the involuntary termination of Mother's parental rights, and there are no issues before us regarding that determination.

incarcerated, sent cards to the children on a monthly basis sent a video of himself reading a book to the children, requested visits with the children which were denied by CYS, and attempted to call the children from prison. The trial court found Father's conduct while incarcerated to be exemplary and it is reasonable to assume that he will get out some time near his minimum sentence. The trial court found that Father was the one primarily responsible for caring for the children and providing for their welfare before his incarceration and is therefore, likely to be able to care for the children after incarceration. The trial court further found that Father's prison sentence was not of such a length to establish that his inability to care for the children cannot be remedied. The record supports the trial court's findings.

*Id.* (unnumbered pages, at 2–3) (Colville, J., dissenting) (footnote omitted).

This Court granted allowance of appeal and we now address the following question as presented in the brief submitted by Father:

Whether the Superior Court of Pennsylvania erred in reversing the Trial Court's placement goal determination and in relying solely on the fact of Appellant's incarceration to terminate his parental rights?

Appellant's Brief at 4.

We begin our analysis by noting that the right to conceive and raise one's children has long been recognized as one of our basic civil rights. *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In any context, the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take. *In re Adoption of Sarver,* 444 Pa. 507, 281 A.2d 890, 891 (1971). Realizing the significance of such a decision, this Court adheres to the view that the trial court is in the best position to determine credibility, evaluate the evidence, and make a proper ruling. *In re Adoption of Atencio,* 539 Pa. 161,

650 A.2d 1064, 1066 (1994). The trial court's findings in a termination proceeding which are supported by evidence of record are entitled to the same weight given a jury verdict and must be sustained unless the court abused its discretion or committed an error of law. *In re William L.*, 477 Pa. 322, 383 A.2d 1228, 1237 (1978). It is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. *In the Matter of the Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 91 (1998).

The party seeking the termination of parental rights bears the burden of proving that grounds for termination exist by clear and convincing evidence. *In re Adoption of Atencio, supra* at 1066. Clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *Id.* Although this court has stated that the standard of review for an appellate court in these matters is limited to the determination of whether the trial court's decree is supported by competent evidence, *see id.*, we have also explained that the factual findings of the trial court should not be sustained where the court has abused its discretion or committed an error of law. *See In re William L. supra.* Thus, absent an abuse of discretion or error of law, where the trial court's findings are supported by competent evidence, an appellate court must affirm the trial court even though the record could support the opposite result. *In the Interest of R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (2010).

This Court has long held that a parent's absence or failure to support his or her child due to incarceration is not, in itself, conclusively determinative of the issue of parental abandonment. *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652, 655 (1975). Indeed, incarceration alone is not an explicit basis upon which an involuntary termination may be ordered pursuant to Section 2511 of the Pennsylvania Adop-

tion Code.[3] *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super.2000) (*en banc*). Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison to continue and pursue a close relationship with the child or children. *McCray, supra* at 655. An incarcerated parent desiring to retain parental rights must exert him- or herself to take and maintain a place of importance in the child's life. *Adoption of Baby Boy A.*, 512 Pa. 517, 517 A.2d 1244, 1246 (1986).

3. In this case, CYS sought termination pursuant to the grounds set forth 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), which provide as follows:

(a) **General rule**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

286

■ Appellate review of goal change determinations is equally deferential. *See In the Interest of R.J.T.,* supra at 1190 (stating that appellate courts are not in a position to make close calls based on fact-specific determinations and must defer to the trial judges who are in the best position to gauge the likelihood of the success of a permanency plan). In a change of goal proceeding, the best interests of the child and not the interests of the parent must guide the trial court, and the burden is on the child welfare agency involved to prove that a change in goal would be in the child's best interest. *In re D.P.,* 972 A.2d 1221, 1227 (Pa.Super.2009). *See In the Interest of R.J.T.,* supra at 1183–1184 (noting that the trial court correctly observed that it had a responsibility to look to the best interests of the child and not those of the child's parents in a change of goal proceeding); *see also* 42 Pa.C.S. § 6351(g) (setting forth matters to be determined in permanency planning).

In *Adoption of Atencio, supra,* this Court granted allowance of appeal to determine whether the Superior Court had applied an incorrect standard of review when it vacated the trial court's denial of a petition for the involuntary termination of parental rights. That matter did not involve an incarcerated parent, there was evidence presented that could have supported termination, and we acknowledged that disposition of the question whether involuntary termination was warranted represented a close case. Ultimately, however, we determined that because competent evidence existed to support the trial court's conclusions, it was improper for the Superior Court to rely upon the evidence to the contrary precisely because the trial court was in a better position to determine credibility, evaluate the evidence, and make a proper ruling. *Id.* at 1068.

■ In the instant matter, we similarly conclude that there was competent evidence to support the trial court's denial of the petition for involuntary termination. Accordingly, had this been merely a close case, a *per curiam* reversal with citation to *Adoption of Atencio, supra,* and *In the Interest of R.J.T., supra,* might have been an appropriate disposition of the appeal to this Court. However, the Superior

Court's derogation of the proper standard of review here is particularly egregious. The Superior Court determined that the trial court's conclusions were not adequately supported by the record and that the court had abused its discretion, on the basis of Father's incarceration, and because the length of his incarceration is conclusive evidence of his parental incapacity. Importantly, the Superior Court improperly substituted its judgment for that of the trier of fact. The trial court determined that the length of Father's sentence was not so great as to foreclose the possibility of the successful maintenance of the parent-child relationship, and that termination of Father's parental rights would not serve the best interests of the children. The Superior Court viewed the same facts, and drew the opposite conclusion; to wit, "[t]he length of Father's prison sentence supports the conclusion that he cannot remedy the parental deficiencies that led to the Children's placement." Memorandum Opinion, dated 12/22/10, at 17. We state emphatically that this Court has never adopted or countenanced a view that incarceration alone is *per se* evidence of parental incapacity or that it represents appropriate and sufficient grounds for the involuntary termination of parental rights. Indeed, the law in Pennsylvania is quite the opposite, and we reiterate the definitive principle that when a parent uses the opportunities that are available in prison to make sincere efforts to maintain a place of importance in the lives of his or her children, incarceration alone will not serve as grounds for the involuntary termination of his or her parental rights.[4] Accordingly, we reverse the order of the Superior Court with respect to its determination regarding the involuntary termination of Father's parental rights.

 With respect to the Superior Court's reversal of the trial court's order denying the petition of CYS for a goal change from reunification to adoption, we note that the trial

4. We make no ruling with respect to the involuntary termination of parental rights grounded on the prohibitive length of a parent's sentence of incarceration. We only note here, as the trial court properly did, that even if Father serves his maximum term of incarceration, R.I.S. and A.I.S. will still be only seven- and nine-years-old, respectively, upon his release.

court concluded that reunification should remain the goal. In its Rule 1925(a) opinion, the trial court stated that the challenge on appeal to that ruling was "simply another way of making the same arguments addressed in the previous five contentions [relating to the involuntary termination of parental rights] and, therefore, needs no further response." Trial Court Opinion, dated 5/18/10, at 4–5 (unnumbered pages). Questions regarding the propriety of an order granting or denying a goal change petition are, of course, discrete inquiries requiring an analysis of interests exquisitely separable from those interests reviewed in questions relating to the involuntary termination of parental rights. *In the Interest of R.J.T., supra.* Thus, although we reverse the Superior Court's determination regarding the goal change petitions, we remand to the trial court for an examination of the merits of those petitions under the appropriate analytical model.

Reversed and remanded to the trial court for further proceedings not inconsistent with this Opinion.

Justices EAKIN and BAER join the opinion.

Justice SAYLOR files a concurring opinion, in which Chief Justice CASTILLE joins.

Justice BAER files a concurring opinion.

Justice TODD files a concurring opinion, in which Justice BAER joins.

Justice ORIE MELVIN files a dissenting opinion.

Justice SAYLOR, concurring.

I concur in the result, while joining the thoughts independently expressed by Mr. Justice Baer in his well-reasoned concurrence. I write here to explain further my conclusion that the common pleas court's determination should be reinstated.

Although, as noted, I favor the result reached by the majority, I do not find the Superior Court's position entirely unfounded. To my mind, this was indeed a close case, as the common pleas court recognized. *See* N.T. March 2, 2010, at 4

(reflecting the court's statement that "I find myself basically completely 50/50 on th[e] issue" of whether it would be in the children's best interest to await reunification with Father where such reunification might not occur for several years). Moreover, I am in substantial agreement with Madame Justice Orie Melvin's dissenting expression to the degree it recognizes that the Superior Court reasonably undertook to promote the children's best interests pursuant to Section 2511(b) of the Adoption Act, 23 Pa.C.S. § 2511(b). *See In re R.I.S.*, Nos. 791–792, 828–829 MDA 2010, *slip op.* at 16, 23 A.3d 591 (Pa.Super. Dec. 22, 2010) (applying a totality-of-the-circumstances test), *summarized in* Dissenting Opinion, at 583–84 (Orie Melvin, J.).

I ultimately believe, however, that the Superior Court did not afford sufficient deference to the common pleas court's determination under the circumstances. If it were certain that the foster parents were willing to adopt the children, I might conclude differently. However, the record contains no indication that the foster parents are willing to provide a permanent home.[1] This is an important factor because, absent adoption by the foster parents, permanency for the children will necessarily involve a different family and a breaking of the existing bond with the foster parents. In turn, this appears to tip the balance in favor of a determination that the common pleas court acted within its discretion in, essentially, deciding to wait and see whether Father will be able to provide permanency within a reasonable timeframe.

Chief Justice CASTILLE joins this concurring opinion.

Justice BAER, concurring.

I join the Majority Opinion but write separately to distance myself to the extent the opinion can be read to create or

---

1. *See generally R.I.S.*, Nos. 791–792, 828–829 MDA 2010, *slip op.* at 19 (observing that the record supported a conclusion that the children were "happily bonded" with the foster parents, but remaining silent as to whether the latter had expressed any interest in adopting); Brief for Appellee at 9–10 (emphasizing the children's bond with the foster parents, and separately noting the existence of a "preadoptive resource" without specifying that the resource is the foster parents).

perpetuate a bright-line rule that "a parent's incarceration, standing alone, cannot constitute proper grounds for termination of his or her parental rights." Maj. Op. at 278, 36 A.3d at 569. The issue is too nuanced to be addressed with a bright-line rule. While the mere fact that the parent was incarcerated or is incarcerated during the pendency of a dependency case does not serve as grounds for termination, the length of a parent's incarceration, standing alone, can satisfy the statutory grounds for termination under 23 Pa.C.S. § 2511 and, thereby, legally support a trial court's decision to terminate parental rights. Secondly, while I agree that the case must be remanded for reconsideration of the goal change petition due to the trial court's failure to present a full analysis of this distinct question, I write to note that the lower tribunal has been properly pursuing concurrent planning to allow for either adoption or reunification, dependent upon the subsequent development of the facts in this case, notwithstanding its unfortunate conflation of the termination and goal change issue in its verbal opinion deciding the question now before the Court.

### A. *Termination of Parental Rights*

I agree with the Majority "that this Court has never adopted or countenanced a view that incarceration alone is *per se* evidence of parental incapacity." Maj. Op. at 287, 36 A.3d at 574. However, this statement can be misleading. There is no question that the fact of incarceration, regardless of why, is not in and of itself determinative of parental incapacity. Moreover, the fact of incarceration during an ongoing dependency action will not disqualify a parent from resuming parental responsibility so long as the parent will be released quickly enough to permit the court to provide the child with timely permanency upon reunification. If, however, the length of parent's incarceration will preclude the court from unifying the (former) prisoner and the child on a timely basis in order to provide the child with the permanent home to which he or she is entitled, then the length of sentence, standing alone, should and does meet the legal criteria for involuntary termi-

nation of the incarcerated parent's parental rights under 23 Pa.C.S. § 2511(a), as discussed below.

Although this Court previously stated that "incarceration is not conclusive" on issues of termination, *see In re McCray's Adoption*, 460 Pa. 210, 331 A.2d 652, 655 (1975), it has not considered the relevance of parental incarceration to termination of parental rights since the enactment of the federal Adoption and Safe Families Act of 1997, Pub.L. 105–89 (ASFA), which altered our national view of dependency policy. Prior to the mid–1990s, our national policy toward dependent children was to await reunification of parents and children. While undoubtedly a laudable goal, this single-minded focus on reunification led to 560,000 children in foster care as of September 1998, one-third of whom had been languishing in the foster care system for over three-years and drifting from placement to placement, while their parents were unable to remedy the problems that led to the children's placement. *See* U.S. Dept. of Health and Human Services, Admin. for Children and Families, Child Welfare Outcomes 1998: Annual Report, *available at* http://www.acf.hhs.gov/programs/cb/pubs/cwo98/sec1.htm# faces. In reaction to this dire situation, the United States Congress enacted ASFA, thereby altering the focus of dependency proceedings to include consideration of the need to move children toward adoption in a timely manner when reunification proved unworkable. *See In re Adoption of S.E.G.*, 587 Pa. 568, 901 A.2d 1017, 1019 (2006). One year after ASFA, in 1998, the Pennsylvania General Assembly amended our Juvenile Act in response to the federal legislation. Our statutory scheme was modified to shift the statute's focus from a singular concern with reunification of the family to the dual purposes of preserving family unity when possible, and providing an alternative permanent family for a child when reunification of the biological parent and child could not be timely achieved. *See* 42 Pa.C.S. § 6301(b)(1).[1]

1. For a full discussion of the social crisis that led to the passage of ASFA and the amendments to the Pennsylvania Juvenile Act, see this Court's decision in *S.E.G.*, 901 A.2d at 1018–1019.

Although the General Assembly did not amend the provisions of the Adoption Act addressing termination of parental rights following the adoption of ASFA, the Act's language has never prohibited consideration of a parent's incarceration. Significantly, the Act does not provide specific protection to incarcerated parents, even though it specifically instructs that termination cannot result "solely from environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S. § 2511(b); *cf.* Neb. Rev. Stat § 43–292.02(2) (a petition to terminate parental rights shall not be filed by the state "if the sole factual basis for the petition is that . . . (b) the parent or parents of the juvenile are incarcerated."). Accordingly, I find no statutory basis in the Adoption Act to justify ignoring the parent's incarceration generally and the length of the parent's sentence specifically in considering the propriety of termination of parental rights.

As correctly stated by the Majority, termination of parental rights is governed by 23 Pa.C.S. § 2511.[2] A parent's incarcer-

---

2. In relevant part, 23 Pa.C.S. § 2511, "Grounds for involuntary termination", provides as follows:

(a) General rule—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of

ation is relevant to several of the enumerated grounds. For example, under Section 2511(a)(2), parental rights may be terminated where "[t]he repeated and continued incapacity ... of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity ... cannot or will not be remedied by the parent." It is beyond cavil that in many cases, including the one at bar, an incarcerated parent is confined twenty-four hours a day, seven days a week; obviously resulting in his being incapable of providing the essential parental care, control or subsistence necessary for a child's physical and mental well-being. *Id.*

The question, in such a case, is then whether the incapacity can be remedied, and the length of the prison sentence is the determinative factor. To exemplify, I submit the easy case. If the parent is in jail for life with no possibility of parole, it is obvious that, notwithstanding all of his sincerity or activism, he is unable to alter the reality that he lacks the capacity to provide the child with the essential parental care required for his healthy upbringing. Thus, under 23 Pa.C.S. § 2511(2), the length of incarceration standing alone meets the statutory criteria for termination. Similarly, under subsection (5), a trial court may find grounds for termination of parental rights where a child "has been removed from the care of the parent

the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

by the court ... for a period of at least six months" and "the parent cannot ... remedy those conditions within a reasonable period of time." 23 Pa.C.S. § 2511(a)(5). Again, a lengthy prison sentence may be determinative of the question, as suggested by the Majority Opinion, *see* Maj. Op. at 287 n. 4, 36 A.3d at 574 n. 4. If the child has been removed from the parent's care for at least six months because, *inter alia,* the parent is incarcerated and the incarceration is going to last for years into the future, it is self-evident that the condition which led to the child's removal will continue to exist, and the parent will not be able to remedy it within a reasonable period of time. Under these circumstances, Pennsylvania law allows for termination. Finally, the length of a parent's incarceration is also relevant to the issues raised in Section 2511(a)(8), which directs the court to determine whether the conditions that led to removal continue to exist after twelve months. 23 Pa.C.S. § 2511(a)(8) ("The child has been removed from the care of the parent by the court, ... 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist.... ").

However, the fact that the grounds set forth in Section 2511(a) are met by a lengthy incarceration does not end a trial court's inquiry. Section 2511(b) instructs: "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).[3] This statutory imperative requires that the trial court carefully review the individual circumstances for every child to determine, *inter alia,* how a parent's incarceration will factor into an assessment of that child's best interest. For example, assume that a parent has provided a twelve-year old with all of his essential care from birth, that the parent now finds himself incarcerated for two to four years, and that incarceration is the sole reason the child is declared dependent. In such a case, the child will certainly have substantial emotional bonds to his parent, and

---

3. Indeed, Section 2511(a)(8) also directs that the court look to whether a termination "would best serve the needs and welfare of the child." 23 Pa.C.S § 2511(a)(8).

an excellent case could be made that termination would not be in the child's best interest, even though the parent's incapacity to care for the child will continue for several years. Indeed, if the child was fifteen, this could be so even if the incarceration would last many years.

However, as noted by the trial court in this case, a parent of a very young child who is serving a lengthy term of incarceration presents a very different calculation, involving minimal emotional bonding and substantial delay prior to any hope of reunification. Notes of Testimony (N.T.), March 2, 2010 at 84 ("If it was a longer period of time, if he was going to be in jail for ten years ... I would say, well, the kids are going to be 15 years old before they know him. That's way too late. They deserve to have permanency.") I agree with the trial court. It is incumbent upon the judicial system to be child-focused. Regardless of the heartbreak to a parent, children are entitled to every opportunity for a successful life, and a permanent, loving parental relationship greatly fosters that opportunity. *See e.g. In re B.N.M.*, 856 A.2d 847, 856 (Pa.Super.2004) (holding that a parent's rights must yield "to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated." (internal citations omitted)). Accordingly, I write to emphasize my conclusion that incarceration, and particularly the length of a sentence may provide the proof sufficient to establish by clear and convincing evidence that termination can occur in accord with 23 Pa.C.S. § 2511(a), and should be considered when the best interest of the child is analyzed in accord with Section 2511(b).

Indeed, our Superior Court has recognized in a number of recent cases that a parent's incarceration can support a court's decision to terminate parental rights by serving as evidence of the parent's incapacity to provide for a child. In *In re Adoption of K.J.*, 936 A.2d 1128 (Pa.Super.2007), the court upheld the termination of a mother's parental rights because her minimum prison sentence of eighteen years prevented her from rectifying the condition causing her incapacity to care for

her children, namely, her imprisonment. *Id.* at 1134. Despite her efforts to maintain contact with her children, the court held her incarceration supported termination under Section 2511(a)(2), (5), and (8). *Id.; see also In re A.S.,* 11 A.3d 473, 480 (Pa.Super.2010) (parent's recurrent incarceration is evidence of his parental incapacity because it created an environment that left children without care they need); *In re E.A.P.,* 944 A.2d 79, 85 (Pa.Super.2008) (termination under Section 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs); *id.* at 84 ("Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind ... that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what she is supposed to do in prison.").

Similarly, several of our sister states have explicitly allowed courts to consider a parent's term of incarceration by incorporating incarceration into the statutory factors for termination of parental rights. For example, North Dakota has defined its aggravating circumstances, which excuse the provision of reasonable efforts aimed at reunification, to include where a parent "[h]as been incarcerated under a sentence where the latest release date is: (1) [i]n the case of a child age nine or older, after the child's majority; or (2) [i]n the case of a child, after the child is twice the child's current age, measured in days." N.D. Cent.Code § 27–20–02(3)(f). While our legislature has not provided guidance on the relevance of incarceration to termination, I conclude that a parent's incarceration, and the potentially resulting incapacity, can be considered in determining whether the facts create grounds for termination under Section 2511(a) and whether termination is in the best interest of the children under Section 2511(b).

In my view, the trial court in the case at bar considered the length of father's incarceration as well as the efforts father had made before and during incarceration to maintain and

build a relationship with the children, and concluded that the moving party had not proven by clear and convincing evidence a ground for termination pursuant to 23 Pa.C.S. § 2511(a). The court also opined that the moving party had not proven that termination was in the best interest of the children under Section 2511(b). N.T. at 81–85. As noted above, the court observed that termination would have been appropriate if the sentence had been longer, for example ten years, because the children "deserve to have the permanency." *Id.* at 84. Likewise, the court observed the situation would be reversed, and the decision to deny termination would be obvious, if father's release date was imminent. Given that the record supports the trial court's analysis, I conclude that the trial court was within its discretion to deny the petition to terminate father's parental rights. *See In re Adoption of Atencio,* 539 Pa. 161, 650 A.2d 1064, 1066 (1994). Accordingly, I join in the decision of the majority to reverse the Superior Court.

B. *Goal Change*

As noted by the Majority, the trial court in this case erred by failing to perform the legal analysis attendant to the issue of the goal change when it placed its opinion on the record, and, instead, asserted that the goal change petition was "simply another way of making the same arguments addressed" in relation to the termination of parental rights petition. Tr. Ct. Op., May 8, 2010, at 4–5. The Majority correctly observes that goal change petitions and termination of parental rights petitions are discrete inquiries that should be addressed separately and fully. *See* Maj. Op. at 286–287, 36 A.3d at 574–75; *see also* 23 Pa.C.S. § 2511 (Grounds for involuntary termination); 42 Pa.C.S. § 6351 (Disposition of dependent child). Accordingly, a remand to address the goal change petition is appropriate. I note, however, that the trial court should consider the best interest of the children as they exist presently, rather than the facts at the time of the original petition.

I write separately to highlight that while the trial court failed to provide the necessary analysis, it nonetheless has been appropriately engaging in concurrent planning for some

time. Although not mentioned in the Majority Opinion or the Superior Court opinion below, the trial court in July 2009 and again in December 2009 ordered that the "current permanent placement goal" be "return to parent or guardian" but that the "concurrent placement goal" be "adoption." Permanency Review Orders of July 7, 2009 and December 10, 2009. Given the court's acknowledgement that this case presents a very close case for termination, its use of concurrent planning is noteworthy and laudable in that it allows for a potential reunification with father, but also acknowledges the tenuous nature of father's connection and the not insignificant likelihood that reunification will be unsuccessful for any number of reasons, including the possibility of father's continued incarceration. "Rather than waiting to pursue adoption options until all reunification attempts fail, concurrent planning allows children to move more quickly through the dependency system and into the permanent placement best suited to their individual situation through simultaneous pursuit of reunification and alternative permanent placement." *R.J.T.*, 9 A.3d at 1186. Accordingly, I commend the trial court and urge it to stand ready to pursue aggressively both reunification and termination and adoption when the facts as presented resolve themselves in favor of one of these permanent goals.

Accordingly, I join the Majority Opinion.

Justice TODD, concurring.

I join the Majority Opinion, with the exception of its articulation of the appropriate standard of review. The majority seemingly conflates the concepts of findings of fact and ultimate findings when it suggests that "the factual findings of the trial court should not be sustained where the court has abused its discretion or committed an error of law." Majority Opinion at 284, 36 A.3d at 572. Indeed, it is difficult to understand how a trial court, in making factual findings, could commit an error of law. Instead, I favor simply adopting the standard of review as set forth by our Court last year in *In re R.J.T.*, 608 Pa. 9, 26–28, 9 A.3d 1179, 1190 (2010), which recognizes the appropriate standard for review of a trial

court's findings of fact as well as the proper standard for its conclusions of law: "the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion." *Id.; see generally Christianson v. Ely*, 575 Pa. 647, 655, 838 A.2d 630, 634 (2003) ("An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused." (internal quotation marks omitted)).

I also join the thoughtful expressions voiced by Justice Baer in his concurrence.

Justice BAER joins this concurring opinion.

Justice ORIE MELVIN, dissenting.

I am compelled to dissent since I believe the majority misconstrues the Superior Court's holding. The majority reiterates this Court's jurisprudence that holds incarceration **alone** will not serve as a ground for termination of parental rights. The cases cited by the majority, however, do not stand for the proposition that incarceration can never satisfy the statutory ground of incapacity when the length of that incarceration is factored into the court's assessment of 23 Pa.C.S. § 2511.

Some background is in order. Appellant C.S. ("Father") has two children: A.I.S., born July 5, 2007, and R.I.S., born October 23, 2008 (also collectively referred to as "Children"). A.I.S. has special needs for which he receives speech and physical therapy. R.I.S. suffers from asthma and requires treatments twice a day at a minimum and could receive them up to six times per week. N.T., 3/2/10, at 37.

On June 14, 2008, Father began serving a sentence of imprisonment of four to eight years in Pennsylvania for convictions of possession of a firearm, carrying a firearm without

a license, and receiving stolen property.[1] It appears he currently is incarcerated at SCI Albion in Pennsylvania.

York County Children and Youth Services ("CYS") initially became involved with the family after receiving a referral, on January 21, 2009, alleging that K.H. ("Mother") had no food or diapers for Children and that the family lacked appropriate housing. Additionally, Mother allegedly was leaving Children unattended and selling the family's food stamps. *Id.* at 9. CYS located Mother at a shelter the next day, and she told CYS the children were in the care of her paramour, he refused to return them, and their safety was in jeopardy. She therefore requested emergency placement of Children, which occurred forthwith. *Id.* at 10.[2] On January 26, 2009, following an emergency placement hearing, the trial court continued the children in CYS's care pending a dependency hearing.

CYS filed petitions of dependency on January 28, 2009. *Id.* at 11. The initial dependency hearing scheduled for February 3, 2009, was postponed because Mother requested counsel. At the rescheduled hearing on February 9, 2009, the trial court adjudicated the children dependent, with a goal of family reunification, and placed them in foster care. Father did not object to any of the goals established for him in the three family service plans dated February 9, 2009, July 7, 2009, and December 16, 2009. *Id.* at 12. Father provided proof that he completed one program, entitled "Thinking for a Change," while incarcerated. *Id.* at 17.

On December 9, 2009, which was within eleven months of Children's dependency adjudication, CYS filed petitions to change the goal from reunification to adoption and termination of Mother's and Father's parental rights to both Children. *Id.* at 10. The petitions to terminate parental rights were based upon 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). On March 2, 2010, after a hearing, the trial court granted the petitions to

1. A.I.S. was less than one year old, and R.I.S. was not yet born when Father began serving his sentence.

2. CYS also was involved with Mother's third child, Z.B.S., born May 24, 2006, who has a different father. This appeal does not include any issues relating to Z.B.S.

terminate Mother's parental rights to both children, decisions she did not appeal. It denied CYS's petitions regarding Father. The trial court determined that the only evidence to support either the goal change or termination was Father's incarceration, and it refused to grant CYS's petitions based on that fact alone. The trial court also cited Father's "exemplary" prison record and his attempts to do what he could while incarcerated in order to maintain contact with Children. For example, while in prison, Father allegedly sent cards to Children, participated in the "Reading to Your Children" program, and requested updates on their progress and medical conditions from the CYS caseworker. Father also participated in review hearings and meetings by telephone.

The trial court opined, in response to the Pa.R.A.P. 1925(b) statement filed by CYS, that Father's prison sentence was not of sufficient length to support the conclusion that termination would be in Children's best interests, "especially when within a relatively short time father's minimum prison sentence will be reached and his release is likely, based on his conduct to date." Trial Court Opinion, 5/21/10, at 3. This statement is in direct conflict with its prior statement following the March 2, 2010 hearing wherein the court noted: "If I look at it solely in the interest of the children, I believe, based upon my experience of 20 years in Criminal Court, that the likelihood today of him getting prerelease status is not good. And in fact, in my experience, most people are serving beyond their minimum." Trial Court Order, 3/2/10, at 2. The trial court also suggested that, if contact between Father and Children occurred in the meantime, "reasonable bonds" could be established within a year of Father's release because Children will be five and six years old, respectively, which is "young enough they can still be flexible enough" and not "locked into their respective positions."[3] Id. at 5.

3. Before the March 2, 2010 hearing, contact between Children and Father had never occurred. Father testified that Children's foster parents refused to accept his telephone calls and refused to bring Children to court to see him prior to the hearing. Visitation had not been approved by the trial court because the prison was an eleven-and-one-half-hour round trip from Children's foster home. N.T., 3/2/10, at

The trial court failed to evaluate any of the considerations enumerated in 42 Pa.C.S. § 6351(f), which lists matters to be determined at permanency hearings. It did not acknowledge the proper standard in considering a goal change and, instead, focused exclusively on the petitions to terminate parental rights.

CYS filed an appeal to the Superior Court. The Honorable Cheryl Lynn Allen authored the memorandum reversing the trial court, the Honorable Sallie Updyke Mundy concurred in the result, and the Honorable Robert E. Colville authored a dissenting memorandum. *In re R.I.S.*, 791–792 MDA 2010 and 828–829 MDA 2010, 23 A.3d 591, unpublished memorandum (Pa.Super. filed December 22, 2010). The Superior Court opined that the family service plan goal should have been changed to adoption because Father simply was incapable of caring for his children while in prison. At the earliest, Father would be able to begin performing those duties in June 2012, which is Father's earliest release date. The Superior Court cited the Adoption and Safe Families Act of 1997 (ASFA), Pub.L. 105–89, 111 Stat. 2115 (codified as amended in scattered sections of 42 U.S.C.), which is designed to grant permanency to a child's life by resolving the child's placement needs within eighteen months of an adjudication of dependency. The Superior Court found an abuse of discretion, reasoning that the trial court ignored Children's need for permanency and security. The court concluded that, in light of Father's incarceration and the children's immediate needs, "adoption is the appropriate goal." *In re R.I.S., supra* at 9.

The Superior Court also agreed with CYS's claim that the trial court abused its discretion by failing to terminate Father's parental rights, concluding that termination was appropriate under 23 Pa.C.S. § 2511(a)(2), which provides:

where the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

25. Furthermore, CYS did not have the necessary video equipment to permit video visits.

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

The Superior Court noted that, at the earliest, Father may be released in June 2012 and at the latest, in June 2016. Like the trial court, the Superior Court recognized that even after being released from prison, Father must overcome additional hurdles before being able to care for Children, such as obtaining housing and employment and fulfilling the conditions of parole. The Superior Court considered the trial court's conclusion that Father's possible imminent release, combined with the fact that he cared for A.I.S. before his incarceration, suggested he will do so once again. The court determined that Father's incarceration for four to eight years rendered him incapable of caring for Children in the near future. Moreover, it found that Father's imprisonment should not toll the ASFA in his favor because a parent cannot toll his parental rights while waiting for a more convenient time to perform parental duties. *In re R.I.S., supra* at 16 ("This Court refuses to affirm a decision of the trial court that would, prospectively, remove Children from the only parents they have known, and place them in the custody of a biological father they do not know and with whom they have not bonded- and whose ability to parent Children remains speculative.").

The Superior Court acknowledged that incarceration alone does not provide grounds for termination, but it concluded that "Father's incarceration is evidence of his parental incapacity" because his "failure to comply with the laws of the Commonwealth created a situation and an environment that has left Children without proper parental care." *Id.* at 16–17. The Court also opined that "[t]he **length** of Father's prison sentence supports the conclusion that he cannot remedy the parental deficiencies that led to Children's placement." *Id.* at 17 (emphasis added).

The Superior Court then cited section 2511(b) of the Adoption Act [4] and *In re K.Z.S.*, 946 A.2d 753, 762 (Pa.Super.2008),[5]

4. 23 Pa.C.S. § 2511(b) provides that in terminating the rights of a parent, the court shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child. It also pro-

before concluding that "no bond exists between Children and Father where Father has been incarcerated since A.I.S. was eleven months old and before R.I.S. was even born." *In re R.I.S., supra* at 19. To the contrary, the Superior Court determined that termination would serve the best interests of Children. While observing that the record supported a conclusion that Children were "happily bonded" with their foster parents, the Superior Court was silent regarding whether the foster parents had expressed any interest in adopting the children.[6] Thus, the Superior Court reversed the trial court's orders relating to Father with respect to goal change and termination.

As noted *supra*, Judge Mundy concurred in the result. Judge Colville dissented, echoing Father's and the trial court's view that incarceration, standing alone, is insufficient to terminate parental rights. The dissent concluded that the trial court's findings of Father's "exemplary" efforts in prison were supported by the record. *In re R.I.S., supra* at 3 (Colville, J., dissenting). Judge Colville concluded, however, that since the trial court may not have properly considered the distinction between goal change and termination, the case should be remanded for additional hearings relating to the goal change request. Father filed a petition for allowance of appeal to this Court, and we granted review.

In *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975),[7] this Court affirmed the termination of an incarcerated

vides that parental rights may not be terminated solely due to environmental factors beyond the control of the parent.

5. In *In re K.Z.S.*, the Superior Court affirmed termination of parental rights under 23 Pa.C.S. § 2511(a)(1) and (b) after noting that the child had lived with his foster mother for all but twenty days of his life, and the biological mother had made minimal efforts to comply with her family service plan goals, missing thirty-three of fifty-three scheduled visitation periods with no explanation for her absences. The Superior Court opined that this evidence was sufficient to support an inference that there was no bond between the child and the mother.

6. The record reveals that there is a pre-adoptive home that is willing to adopt Children and their half-sister, Z.B.S.

7. While *Adoption of McCray* proceeded under the prior Adoption Act of 1970 and predated our requirement of proof by clear and convincing

father's parental rights where the evidence established that "he did not take advantage of his visitation rights or his personal counselors nor did he make sincere or persistent efforts to locate or inquire about his daughter." *Id.* at 655 (footnote omitted). We noted that

> a parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness "in declining to yield to obstacles," his other rights may be forfeited.

*Id.* at 655 (citation and footnotes omitted).

Similarly, *Adoption of Baby Boy A.*, 512 Pa. 517, 517 A.2d 1244 (1986), concerned a child who was born to an incarcerated father. Unlike the instant case, the father in *Baby Boy A.* made no effort to establish a bond with his child while he was in prison. After his release, he attempted to contact the child's mother but did little to establish himself in the child's life. The trial court refused to terminate the father's parental rights, and the Superior Court reversed and remanded for an order of termination. We affirmed, stressing that incarceration, standing alone, is not dispositive, but the imprisoned parent must attempt to overcome obstacles and maintain a relationship with his child. *Id.* at 1246. We held that termination was proper because the father had made no effort to overcome the obstacles of incarceration.

The misconception that Father and the majority glean from these cases is that if an incarcerated parent makes any effort to maintain a parent-child relationship, the court may not terminate his parental rights. I do not believe this is a proper explication of the evolution of termination of parental rights

evidence, instead utilizing a standard of preponderance of the evidence, *see In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986), this Court's admonition therein regarding requisite standards in order for an incarcerated parent to maintain a relationship with his child remains vital.

jurisprudence in this Commonwealth since the advent of the ASFA. Although an incarcerated parent may be doing everything required of him while in prison, the child's need for consistent parental care cannot be cast aside or put on hold.

While we have not written since 1986 in *Baby Boy A.* on the relationship between the length of incarceration and termination of parental rights, it is clear that we never held therein that if an incarcerated parent does attempt to maintain the relationship, parental rights may not be terminated. We never foreclosed the possibility that incarceration and the attendant circumstances may render a parent incapable of both providing essential parental care and remediation of that situation. *See* 23 Pa.C.S. § 2511(a)(2). The Superior Court, however, has repeatedly, and I believe properly, advised since we spoke in *Baby Boy A.,* that there is no isolated evaluation on this issue other than the standard set forth in the statute. A court must take into consideration all of the relevant factors, including the nature of the relationship before incarceration, the terms of incarceration, and their effect on a parent's ability to perform parental duties, along with a parent's efforts to remain involved with his child while incarcerated. *See, e.g., In re Z.P.,* 994 A.2d 1108 (Pa.Super.2010) (citing cases).

In addition, the Superior Court consistently has held that the welfare of the child is paramount. Long-term incarceration, where a prisoner's ability to parent his child in the foreseeable future is "speculative at best," will justify termination of parental rights under section 2511(a)(2) even if the parent expresses a willingness to parent the child. *Z.P., supra; In re Adoption of W.J.R.,* 952 A.2d 680 (Pa.Super.2008) (citing cases); *but see In re I.G.,* 939 A.2d 950 (Pa.Super.2007) (reversing trial court's decision to terminate parental rights of incarcerated parent where all available efforts to maintain contact with the children were undertaken, including visitation, there was evidence of a bond between the father and children, and the trial court did not engage in a

"searching inquiry" into the nature of the existing bond between the children).

In fact, this Court has repeatedly recognized:

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

In determining whether parental rights should be terminated, the court must recognize the essential needs of the child as well as the rights of the parent.

When ... a parent is incapable of meeting the child's essential needs, ... the state may constitutionally intervene to protect the "physical or mental well-being" of the child. In these circumstances, the interest of the parent in keeping the child conflicts with the interest of the child in its essential physical and emotional needs and the Legislature has constitutionally mandated that the interests of the weaker party, the child, should prevail. This legislative determination must be accorded great deference for "when an issue involves policy choices as sensitive as those implicated by the involuntary termination of parental rights, the appropriate forum for their resolution in a democracy is the Legislature." (Citation omitted.) *Id.*, [477 Pa.] at 339, 383 A.2d at 1236.

*Adoption of J.J.*, 515 A.2d at 891 (internal citations omitted). I believe the same considerations apply when the incapacity stems from lengthy incarceration and not just from a mental or physical disability.

The trial court failed to apply these fundamental precepts to the totality of the circumstances. The Juvenile Act required the trial court's assessment of the request for a goal change to be child-focused. Instead of deciding what placement was appropriate by assessing what was best suited to the safety,

protection and physical, mental, and moral welfare of the children, the trial court ignored this vital inquiry and focused on Father's interests in avoiding termination of his parental rights. Consequently, there is nothing in the record to support the trial court's denial of the goal change request. Moreover, the trial court's resolution of the termination petition was tainted by its misperception of the holdings in *Adoption of McCray* and *Baby Boy A.* and its failure to consider the paramount interests of the children. Accordingly, I would affirm the Superior Court, as it reached the proper result, although it may not have fully explicated its rationale.

Here, the Superior Court's decision is not squarely in conflict with this Court's case law. The court held that Father's uncertain prospects regarding his ability to parent the Children, combined with a lack of a bond with the Children, outweighed Father's efforts to maintain a presence in Children's life. The Superior Court also acknowledged the simple reality that "incapacity" to conduct parental duties under section 2511(a)(2) is a different inquiry from a "desire" to do so.

The Superior Court determined that the goal change was proper because Father simply was incapable of caring for his children while in prison, and he would not be able even to attempt those duties until June 2012 at the earliest and 2016 at the latest. At that point, Children will be either five and six years old, at the youngest, or nine and ten years old. Neither A.I.S. nor R.I.S. has any recollection of Father; indeed, R.I.S. was not yet born when Father was imprisoned, and A.I.S. was less than one year old. The Superior Court cited ASFA, which is designed to grant permanency to a child's life by resolving his placement needs within eighteen months. The Superior Court found an abuse of discretion, reasoning the trial court ignored Children's need for permanency and security and concluding, in light of the length of Father's incarceration and the Children's immediate needs, that "adoption is the appropriate goal." *In re R.I.S.*, *supra* at 9. I agree. The trial court's contrary conclusions were based on nothing more than speculation and its misapprehension of

the applicable standards by balancing Father's best interests against the Children's.

In my view, the resultant incapacity derived from a parent's incarceration, in light of the length of the sentence imposed, can and should be considered in the evaluation of whether termination is appropriate under 23 Pa.C.S. § 2511(a)(2), (5), and (8), and whether it is in the children's best interests pursuant to 23 Pa.C.S. § 2511(b). Therefore, I would affirm the Superior Court, and I dissent.