J-A26041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.W., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.W., FATHER | : | No. 1217 EDA 2021 |

Appeal from the Order Entered June 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002042-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: H.W., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.W., FATHER | : | No. 1218 EDA 2021 |

Appeal from the Order Entered June 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000083-2021

BEFORE:   BOWES, J., STABILE, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:               **FILED DECEMBER 30, 2021**

M.W. (Father) appeals from the orders entered in the Philadelphia

County Court of Common Pleas, terminating his parental rights to his four-

year old son, H.W. (Child) and changing the dependency goal to adoption. [1]

---

[1] This Court consolidated Father's two appeals.  We further note that the parental rights of H.W.'s mother, A.B. (Mother), were also terminated that same day, June 1, 2021.  Mother's appeals are currently pending before this same panel at 1281 EDA 2021 *et seq*.

*(Footnote Continued Next Page)*

Father argues the Department of Human Services (DHS) agency improperly focused solely on the fact of his incarceration, and failed to meet its burden of proof. After careful review, we agree and conclude the trial court erred in finding DHS established grounds for termination under 23 Pa.C.S. § 2511(a)(1), (2), (5), or (8). Accordingly, we reverse both orders.

## I. Facts & Procedural History

Child was born in March of 2017,[2] and Father has been incarcerated for the duration of Child's life. N.T., 4/28/21, at 59. We note DHS also filed termination and goal changes petitions for Child's older half-sibling, J.B., born in 2013, and younger half-sibling, M.J., born in 2018. Throughout this case, the trial court has reviewed the dependency matters for all three children together.

The evidence and procedural history concerning Mother, as well as her care of Child, J.B., and the third sibling, M.J. has been set forth in detail in the trial court's opinion. As the parties and trial court are well familiar with that history, we do not reproduce the entirety of it here. **See** Trial Ct. Op. at 2-13. Instead, we summarize the following.

---

H.W. has two half-siblings, J.B. and M.J. The parental rights of their father, G.J., were likewise terminated. His appeals are pending before this Court at 1344 EDA 2021, 1345 EDA 2021, 1346 EDA 2021, and 1347 EDA 2021.

[2] No father was listed on Child's birth certificate. Trial Ct. Op., 7/27/21, at 2.

In August of 2018, DHS received a general protective services (GPS) report, that another older half-sibling, J.T., was receiving trauma therapy for post-traumatic stress disorder, "stemmed from severe physical and psychological abuse by his Mother[.]" Trial Ct. Op. at 2. The report also alleged

> Mother was physically abusive to J.B. and J.T.[,] there was an active Protection from Abuse (PFA) Order against Mother on behalf of the Children; that Mother had been arrested for violating the PFA Order by stalking J.T.'s Father and trying to contact him in retaliation for losing custody of J.T.; that Mother had a criminal history of assault in the past; that Mother had a history of severely abusing the Children; and that Mother was diagnosed with substance abuse and depression. This Report was determined to be valid.
>
> On October 11. 2018, DHS implemented In-Home Services . . . through Community Umbrella Agency (CUA) Turning Points for Children (TP4C).

*Id.* at 3 (record citations omitted).

On January 24, 2019, DHS received a child protective services (CPS) report

> that Mother was not adequately supervising her Children; that [Child] had a burn on his back that he sustained from hot grease two weeks prior to the Report; that it was unknown how [Child] had sustained the burn; that [Child's] burn appeared severe; that Mother did not seek medical care for [Child]; and that Mother was not present in the home at the time of the incident.
>
> The Report alleged that Mother did not have a good relationship with her Children; that Mother yelled a lot at the Children and hit the Children to control their behavior; and that [J.B.] resided with his Father[.] The Report further alleged . . . that Mother displayed behaviors which possibly suggested that she suffered from mental health issues; and that Mother used phencyclidine (PCP). This Report was determined to be indicated.

Trial Ct. Op. at 4-5 (paragraph break added and record citations omitted). A second report, issued the following day, stated "H.W. was diagnosed with a 2nd degree burn with a surface area wound measuring ten centimeters by seven centimeters on his upper back region[.]" *Id.* at 7.

Child was adjudicated dependent on June 6, 2019, when he was two years old. On February 16, 2021, DHS filed petitions to involuntarily terminate both Father's and Mother's parental rights, and on March 2nd, petitions to change Child's permanency goal to adoption. The trial court conducted a hearing on April 28, 2021; we note that at this time, Child had recently turned four years old. Father was incarcerated at SCI-Somerset and appeared by telephone. He was represented by counsel. We note the testimony given by and about Father was not disputed.

"In 2015, [Father pleaded] guilty to the unlawful possession of controlled substance." Trial Ct. Op. at 8. In 2017 — the year of Child's birth — Father pleaded guilty to endangering the welfare of a child, aggravated assault, simple assault, and recklessly endangering another person. N.T., 4/28/21, at 18. In December of 2017, he received a sentence of three to six years' imprisonment. *Id.* Father's minimum release date was May of 2022. *Id.* at 62, 102. No further information about his criminal offenses was presented. *See id.* at 18. As stated above, Father was incarcerated at the time of Child's birth, and has remained incarcerated throughout Child's life. *Id.* at 59.

- 4 -

Jasmine Jackson, the case manager with Turning Points for Children, testified to the following. Father was not "any indicator for perpetrator of [the CPS] reports." N.T., 4/28/21, at 126. He initially had one "single case plan objective[ ]:" "to maintain contact with [her] for case planning. *Id.* at 103, 127. Case Manager Jackson did have communication with Father, by letter and telephone. *Id.* at 61. When Father informed her he was taking parenting and GED classes at the prison, both were added to his single case plan objectives. *Id.* at 103. These were his only case plan goals. *Id.* at 127.

Furthermore, Case Manager Jackson observed telephone conversations between Child and Father, when Mother called Father during her visits with Child. N.T., 4/28/21, at 104. Based on these telephone calls, Case Manager Jackson believed there was no parent-child bond between Father and Child. *Id.* However, she also testified "everything [was] appropriate during those phone conversations." *Id.* at 126. Father requested virtual visits with Child and provided the name of a contact person, but when Case Manager Jackson contacted that person, she did not receive a reply. *Id.* at 126-27. Additionally, Father has not had telephone contact with Child through the foster parents. *Id.* at 126.

Father testified to the following. Due to the COVID-19 pandemic, all prison programs, "except for school[,]" were "stopped." N.T., 4/28/21, at 108. However, prior to the pandemic, he was participating in both GED and parenting classes, and he was to begin violence prevention class in the fall of

2021. *Id.* at 109. Mother previously brought Child to visit him weekly at county jail, and Child was excited to see him, and would smile and laugh. *Id.* at 109-10. He wished for Child to return to Mother, testifying, "[T]he children would have food. . . . And they had clothes that still had tags on them. So I never really had nothing bad to say about her or show she treated the children." *Id.* at 110. Father wished that he were at home, so that his relationship with Child "would be better than what it is now." *Id.* at 111. However, he acknowledged, "[D]ue to the fact that I've been gone for so long, he probably wouldn't even remember me." *Id.* Father likewise testified that he discussed having virtual visits with Case Manager Jackson, who "wrote an e-mail to the deputy that work[s] in visitation that can help with these kinds of visits[.]" *Id.* Father "check[s] in" about the visits "here and there," but has not received any further information. *Id.*

When asked why reunification between Father and Child has "been ruled out," Case Manager Jackson responded: "Due to his incarceration and his continued incarceration. He's not available to be a resource for the child." N.T., 4/28/21, at 103. She also testified she did not believe termination of Father's rights would cause irreparable harm to Child. *Id.*

The trial court held a second hearing on June 1, 2021, at which the court heard testimony from J.B. and M.J.'s father. At this juncture, we note the children were removed from their foster home in February of 2021 "due to a valid report of inappropriate discipline." N.T., 4/28/21, at 105, 125. The three

children — Child, J.B., and M.J. — were living in different foster homes. N.T., 6/1/21, at 79.

At the end of that hearing, the trial court terminated Father's parental rights to Child, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). The court also terminated Mother's rights to her three children, and changed all three children's goals to adoption. Father timely filed a notice of appeal and Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal.

## II. Statement of Questions Involved

Father presents the following issues for our review:

1. Did the Trial judge rule in error that [DHS met] its burden of proof that Father's parental rights to his child be terminated[?]

2. Did the trial judge rule in error that the termination of Father's parental rights would best serve the needs and welfare of [Child?]

3. Did the Trial judge rule in error that [DHS met] its burden of proof that the goal be changed to adoption[?]

4. Did the judge rule in error that it was in the child's best interest to change the goal to adoption[?]

Father's Brief at 5.

## III. Standard of Review for Termination & Section 2511

We note the general standard of review for the termination of parental rights:

[W]e are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial

- 7 -

court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

**Interest of C.S.**, 761 A.2d 1197, 1199 (Pa. Super. 2000) (*en banc*) (citations omitted).

We further note the standard of review of a goal change order:

Appellate review of goal change determinations is equally deferential. In a change of goal proceeding, the best interests of the child and not the interests of the parent must guide the trial court, and the burden is on the child welfare agency involved to prove that a change in goal would be in the child's best interest.

**In re R.I.S.**, 36 A.3d 567, 573 (Pa. 2011) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. **See** 23 Pa.C.S. § 2511. Here, the trial court found grounds for termination under the following subsections:

**(a) General rule. —** The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations. —** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

*See* 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b).

Section 2511 requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Our Supreme Court has stated:

The party seeking the termination of parental rights bears the burden of proving that grounds for termination exist by clear and convincing evidence. Clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. Although this court has stated that the standard of review for an appellate court in these matters is limited to the determination of whether the trial court's decree is supported by competent evidence, we have also explained that the factual findings of the trial court should not be sustained where the court has abused its discretion or committed an error of law.

*In re R.I.S.*, 36 A.3d at 572 (citations omitted).

Our Supreme Court has addressed the termination of an incarcerated

parent's parental rights:

This Court has long held that a parent's absence or failure to support his or her child due to incarceration is not, in itself, conclusively determinative of the issue of parental abandonment. Indeed, incarceration alone is not an explicit basis upon which an involuntary termination may be ordered pursuant to Section 2511[. *Interest of C.S.*, 761 A.2d at 1201.] Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison to continue and pursue a close relationship with the child or children. An incarcerated parent desiring to retain parental rights must exert him- or herself to take and maintain a place of importance in the child's life.

- 10 -

*In re R.I.S.*, 36 A.3d at 572-73 (some citations omitted).

## IV. Termination of Father's Parental Rights Under Section 2511(a)

In his first issue, Father challenges the sufficiency of the evidence supporting the trial court's termination of his parental rights pursuant to Subsections (1), (2), (5), and (8). We first consider his argument that Subsections (5) and (8) are not implicated when a child is not removed from the care of the parent. *See* Father's brief at 22-23. We agree.

Both Subsections (5) and (8) require that "[t]he child has been removed from the care of the parent." 23 Pa.C.S. § 2511(a)(5), (8). An *en banc* panel of this Court has held that termination under these two subsections is not appropriate where the record shows the child was never in the parent's care, and therefore could not have been "removed" from their care. *Interest of C.S.*, 761 A.2d at 1200 & n.5.

Here, Case Manager Jackson's undisputed testimony is that Father was incarcerated at the time Child was born, and has been incarcerated throughout Child's life. We conclude that because Child was never in Father's care, termination under Subsections (a)(5) and (8) was improper. *See Interest of C.S.*, 761 A.2d at 1200 & n.5.

With respect to Subsections (a)(1) and (2), Father presents largely the same supporting discussion. He maintains he was engaged in all his plan goals — maintaining contact with the CUA case manager and attending parenting and GED classes at the prison, until they were suspended during

the COVID-19 pandemic. Father requested virtual visits with Child, but Case Manager Jackson's attempts to contact the appropriate person were unsuccessful. Father avers DHS's sole argument for termination was the fact of his incarceration; however, Father contends, incarceration alone is not proper grounds for termination. After careful review, we agree that the trial court erred in finding DHS met its burden of proof under Subsections (a)(1) and (2).

Preliminarily, we observe that the vast majority of the evidence presented at the April 28 and June 1, 2021, hearings pertained to Mother. The evidence concerning Father was limited to a copy of his criminal history and Case Manager Jackson's testimony, the entirety of which we summarized above. *See* N.T., 4/28/21, at 18, 59, 61-62, 102-04, 126-28. Furthermore, while the trial court issued a separate, 45-page opinion pertaining to Mother, a significant portion of its opinion, addressing Father's appeal, relates to factual and procedural history involving Mother only. *See* Trial Ct. Op. at 2-8, 16-17.

As stated above, Father was not found to be the perpetrator of any abuse in this case. *See* N.T., 4/28/21, at 126. Father initially only had one goal — to maintain contact with CUA Case Manager Jackson — and he was compliant with that goal. When Father informed her that he was participating in parenting and GED classes in prison, those classes were added to his plan. Case Manager Jackson confirmed these were his only goals, and DHS made

no allegation that he was failed to comply. *See* N.T., 4/28/21, at 127. The only goal that Father was ostensibly not actively pursuing was the parenting class, but he explained this class was suspended due to the COVID-19 pandemic. Significantly, Case Manager Jackson acknowledged Father's request for virtual visits with Child, but the person she attempted to contact, in order to arrange such visits, did not reply to her. *See id.* at 126-27.

Finally, we consider that, with respect to Subsections 2511(a)(1) and (2), the sole reason given by Case Manager Jackson for Father's termination was the mere fact of his incarceration. Case Manager Jackson testified as follows:

> [Attorney for DHS]: And as far as the Father of [Child], did you establish single case plan objectives for him while he's incarcerated to work towards being able to be in a position to parent his child?
>
> [Case Manager Jackson]: Yes. His single case plan objective . . . he had explained to me that he was engaged in parenting as well as a GED program.
>
> Q: Okay.
>
> A: He [sic] added those to the single case plan.
>
> Q: Okay. **And despite those participation in those types of programs while incarcerated**, do you believe reunification is a possible goal for [Child] and Father at this time . . . ?
>
> A: No.
>
> Q: And why has reunification between [Child] and [Father] been ruled out?
>
> A: **Due to his incarceration and his continued incarceration. He's not available to be a resource for the child.**

Q: And do you believe that would cause [Child] irreparable harm if the Court were to terminate his rights?

A: No, I don't.

N.T., 4/28/21, at 103 (emphases added).

In its opinion, the trial court sets forth the undisputed evidence pertaining to Father, as we have summarized above. Trial Ct. Op. at 17-20. The court then sets forth its analysis, in sum, as follows:

This Court found that Father's continued incapacity caused the Child to be without essential parental care, control or subsistence, and the causes of the incapacity could not or would not be remedied by him, establishing grounds for termination of his parental rights.

*Id.* at 20.

While the trial court did not cite any portion of Subsection 2511(a) here, we note it paraphrased the language of Subsection (2). *See* 23 Pa.C.S. § 2511(a)(2) ("The repeated and continued incapacity . . . of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity . . . cannot or will not be remedied by the parent."). The court acknowledged Father met all three of his plan objectives, and the fact that he requested virtual visits, but Case Manager Jackson did not receive any

reply from the person she contacted to arrange such visits.[3] However, absent from the trial court's analysis was any discussion of Father's status as an incarcerated parent, or whether he "has utilized those resources at his . . . command while in prison to continue and pursue a close relationship with" Child. *See In re R.I.S.*, 36 A.3d at 573.

Mindful of our deferential standard of review, we conclude the trial court erred in finding DHS presented clear and convincing evidence establishing grounds for termination. *See* 23 Pa.C.S. § 2511(a)(2); *In re R.I.S.*, 36 A.3d at 572. When asked specifically why reunification would not be possible, Case Manager Jackson's sole reason was Father's incarceration and consequent inability "to be a resource for the child." N.T., 4/28/21, at 103. As discussed above, "a parent's incarceration, standing alone, cannot constitute proper grounds for the termination of his or her parental rights." *See In re R.I.S.*, 36 A.3d at 569. Father was compliant with all three of his goals (notwithstanding the suspension of parenting classes due to the COVID-19 pandemic), and attempted to use the resources available to him — the assistance of Case Manager Jackson — to have virtual visits with Child. *See*

_____

[3] Relatedly, we note the trial court's voiced appreciation to the prison official who facilitated Father's appearance by telephone at the April 28, 2021. *See* N.T., 4/28/21, at 116 (trial court advising the prison official: "I wanted to specifically thank you and the prison authorities for providing him [sic]. I do a lot of these, and we normally don't get that kind of cooperation from prison authorities. . . . ").

*id.* at 573. Case Manager Jackson also testified that Father has not had telephone calls with Child through the foster parent, but provided no explanation why that option has not been pursued or was not advisable. **See** N.T., 4/28/21, at 126. As stated above, Case Manager Jackson testified that Father's previous telephone calls with Child were appropriate. **See id.** Finally, we note the court did not address the relevance of the fact that Father's minimum release date (May of 2022) was within one year of the termination hearing.

For the foregoing reasons, we conclude the trial court erred in finding DHS presented clear and convincing evidence under Subsection 2511(a)(1) and (2) for termination.

We acknowledge the trial court also found grounds for termination under Subsection (b), which relates to the parent/child bond and best interests of Child. Father's second issue on appeal is a challenge to this finding. However, without grounds for termination under Subsection (a), we do not reach the analysis under Subsection (b). **See In re L.M.**, 923 A.2d at 511 ("Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.").

Accordingly, we reverse the order terminating Father's parental rights.

## V. Goal Change

Father's remaining two issues on appeal pertain to: (1) the sufficiency of the evidence for the goal change; and (2) the effect of the goal change on Child.  In light of our disposition of his first issue, we reverse the order changing Child's goal to adoption.

## VI. Conclusion

For the foregoing reasons, we reverse the orders terminating Father's parental rights and changing Child's goal to adoption.  Jurisdiction relinquished.

Judge Stabile joins the Memorandum.

Judge Bowes files a Dissenting Memorandum.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/30/2021*