**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| TERMINATION OF PARENTAL RIGHTS TO N.I.G., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.G., FATHER | : : : : : : : : : | No. 1456 MDA 2022 |

Appeal from the Decree Entered September 14, 2022
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-9241

BEFORE:  BOWES, J., STABILE, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED: JULY 17, 2023**

M.G. ("Father") appeals from the decree that granted the petition to involuntarily terminate his parental rights to his child, N.I.G ("Child"), a daughter born in June 2006.[1]  We affirm.

The certified record reveals the following facts and procedural history. Child lived with her mother ("Mother") and had no contact with Father until 2018, when she was twelve years old.  At that time, a child welfare agency relocated Child based on criminal charges that Mother abused her, and Child moved to Pennsylvania to live with Father.  **See** N.T., 5/2/22, at 6-7; N.T., 6/9/22, at 9, 70.

_____

[1] By separate decree the same date, the Orphans' Court involuntarily terminated the parental rights of R.M. ("Mother").  Mother did not appeal, and she is not a party to Father's appeal.

Child lived with Father for fewer than four months. *See* N.T., 6/9/22, at 66. Father then left Child in her aunt's care stating that he did not have the ability to care for her himself. *See* N.T., 5/2/22, at 7-8, 16. Father later acknowledged that he "was running from parole" at the time, and he was re-incarcerated in December 2018. *See* N.T., 6/9/22, at 18, 24-25.

In December 2018, when her aunt could no longer care for Child, the Orphans' Court placed Child in the custody of Luzerne County Children and Youth Services ("CYS"); Child entered shelter care, and the court adjudicated her dependent later that month. *See* N.T., 5/2/22, at 6. Child had been truant from school and suffered from scoliosis for which she had not received medical care. *See* N.T., 6/9/22, at 10, 19. In furtherance of the goal of reunification, Father was required to satisfy permanency objectives that involved improving his parenting skills and attending drug and alcohol services. *See* N.T., 5/2/22, at 9.

On December 6, 2021, CYS filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[2] At the time, Father remained incarcerated and had not participated in any programs related to his permanency objectives.

_____

[2] Four days later, the Orphans' Court appointed the Corbett Price Law Firm as Child's legal counsel and guardian *ad litem* ("GAL"), and court directed counsel to determine immediately if a conflict of Child's interests existed requiring the
*(Footnote Continued Next Page)*

The Orphans' Court conducted evidentiary hearings on the CYS termination petition *via* Zoom on May 2, 2022, and June 9, 2022. CYS presented the testimony of its caseworker, Sherry Hartman ("Hartman"), the casework supervisor, Jessica Timek ("Timek"), and the court appointed special advocate ("CASA"), Jade Levi. Father testified on his own behalf from State Correctional Institution – Dallas. In addition, Child testified that she preferred to be adopted. **See** N.T., 6/9/22, at 12-15.

Hartman testified that Child had been in placement for forty-two months at the time of the second hearing. **See** N.T., 6/9/22, at 37. Hartman testified that Father attended a parenting class, although she had no information on its curriculum and did not know what skills he acquired. **See** N.T., 5/2/22, at 10, 32.[3] Hartman testified that Father wrote letters to Child but Child did not

_____

appointment of a separate GAL to represent Child's best interests. Counsel did not request a separate appointment.

Pursuant to **In re K.M.G.**, 240 A.3d 1218 (Pa. 2020), this Court must engage in *sua sponte* review to determine if the Orphans' Court appointed counsel to represent the child's legal interests in a contested termination proceeding. Where a GAL/counsel was appointed to represent both the child's legal and best interests, this Court must review *sua sponte* whether the Orphans' Court determined that those interests did not conflict. **Id.** at 1236. Our review is deferential to the Orphans' Court; the Supreme Court has expressed that it is "especially hesitant to have appellate courts reweigh an [O]rphans' [C]ourt's determination that the interests do not conflict." **See id**. Instantly, the Orphans' Court determined, after speaking to Child who was about to turn sixteen years old, that no conflict existed between Child's legal and best interests. **See** N.T., 6/9/22, at 12-15.

[3] Father told Hartman that pandemic-related limits prevented him from receiving drug and alcohol services in prison. **See** N.T., 5/2/22, at 10, 32.

receive them because of her frequent placement changes. *See* N.T., 5/2/22, at 10-13. Hartman testified that she spent five months persuading Child to participate in a phone call with Father and that as a result of her efforts the call occurred in June 2021. Hartman testified that Child was "hysterical" after the call, refused to go to counseling with Father, and refused thereafter to have any contact with Father. *See id*. at 14, 20-22, 42, 47. Hartman opined that Father, who had no contact with Child until she was twelve years old, had not demonstrated the ability to remedy the conditions that led to Child's placement, could not provide a stable home for her, and termination would serve Child's needs. *See id*. at 14-15, 17, 20.

At the time of the second hearing, Child had been in a foster home for ten months, bonded with her foster mother, made progress in school, and begun receiving mental health services. Hartman testified that foster mother provides clothing, shelter, food, and other items for Child, keeps her immunizations up to date, and has been consistently emotionally supportive when Child experiences outbursts relating to her feeling that nobody wants her. *See* N.T., 6/9/22, at 38-43, 58. Hartman testified that there is "for the most part" a parent-child bond between Child and foster mother. *Id*. at 41. Foster mother wants to adopt Child, and Child wants to be adopted by foster mother. *See id*. at 12-15, 43, 51, 59-60. Although Child has continuing struggles with her feelings of abandonment by Father, Hartman believed that termination of parental rights would be beneficial for Child and relieve her of

"guilt, stressors, [and] struggles." *See id*. Hartman said that Child still loves her parents and wants to be able to contact Father but needs separation from both parents. *See id*. at 39, 51-53, 55, 58.

Timek testified that before his incarceration, Father failed to ensure that Child attend school. Timek also testified that after Father was given reunification goals, he did not engage in any of the required services or do anything to accomplish his goals, and that as a result of his incarceration did not have stable housing. *See* N.T., 6/9/22, at 16-17, 20.

Father testified that when he first received Child, he was "running from parole" and could not keep her. *See id*. at 24. Father claimed that after the dependency proceeding and his incarceration, he tried to contact CYS repeatedly but they did not respond; concerning the letters and packets CYS sent him, he said they were in English and he did not understand them. *See id*. at 27.[4] Father also claimed that the prison officials he spoke to did nothing. *See id*. at 27. Father said when he learned Child was in CYS custody, he sought suggestions from other inmates and sent letters to a court he could not identify. *See id*. at 35. Father testified that his minimum prison date was August 6, 2023 and his maximum date was December 22, 2025, when Child would be nineteen and one-half years old. *See id*. at 30.

---

[4] He claimed that two people from CYS visited him in 2019 but he lost his notes concerning their visit. *See id*. at 32-33.

At the conclusion of the second hearing, the Orphans' Court took the case under advisement. By decree dated September 12, 2022, and docketed on September 14, 2022, the Orphans' Court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b). Father timely appealed and complied with Pa.R.A.P. 1925(a)(2)(i) and (b). The Orphans' Court thereafter filed its Rule 1925(a) opinion.

On appeal, Father presents the following issues for our review:

[1]. Whether the trial court erred in terminating parental rights and/or abused its discretion with respect to . . . Section 2511(a)(2) of the Adoption Act?

[2.] Whether the trial court erred in terminating parental rights and/or abused its discretion with respect to . . . Section 2511(b) of the Adoption Act?

**See** Father's Brief at 3.

Father's issue implicates the involuntary termination of parental rights. Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. **See** 23 Pa.C.S.A. §§ 2101-2938. We review involuntary termination orders for an abuse of discretion, which requires an error of law or a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **See In re Adoption of L.A.K.**, 265 A.3d 580, 591 (Pa. 2021) (citation omitted). In applying this standard, an appellate court must accept the trial court's findings of fact and credibility determinations if supported by the record. **See Interest of S.K.L.R.**, 256 A.3d 1108, 1123 (Pa. 2021); **see also In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021). This standard

"reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings." *In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012).

In considering a petition to terminate parental rights, a court must balance the parent's fundamental right "to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *See C.M.*, 255 A.3d at 358. Termination of parental rights can have "significant and permanent consequences for both the parent and child." *L.A.K.*, 265 A.3d at 591. Pennsylvania law requires the moving party to establish the statutory grounds by clear and convincing evidence, evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022). We remain mindful that "a parent's basic constitutional right to the custody and rearing of [his] child is converted, upon the failure to fulfill [his] parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Here, the Orphans' Court terminated Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a) (2), and (b). To affirm the decree, we must agree with the court's decision as to the grounds under subsection

2511(a), along with subsection (b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We review the evidence relating to section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . ..

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the application of subsection (a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect, or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control, or subsistence; and (3) that the causes of the incapacity, abuse, neglect, or refusal cannot and will not be remedied. **See In re Adoption of A.H.**, 247 A.3d 439, 443 (Pa. Super. 2021). Subsection (a)(2) emphasizes the child's present and future

- 8 -

need for essential parental care, control or subsistence, not the parent's refusal to perform their duties, and thus "should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties. . .. *This is particularly so where the disruption of the family has already occurred and there is no reasonable prospect for reuniting it."* *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. 2010) (citation omitted) (emphasis in original). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities and must exercise reasonable firmness in resisting obstacles placed in the path of maintain the parent-child relationship. *See Matter of Adoption of M.A.B.*, 166 A.3d 434 (Pa. Super. 2017).

Each involuntary termination case involving an incarcerated person is analyzed on its own facts, "keeping in mind . . . that the child's need for consistent parental care and stability cannot be put aside or put on hold." *See In re R.I.S.*, 36 A.3d 567, 569 (Pa. 2011), quoting *In re E.A.P.*, 944 A.2d 79, 84 (Pa. Super. 2008). While not a litmus test for termination, "incarceration . . . can be determinative of the question of whether a parent is incapable of providing essential parental care, control or subsistence." *Interest of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation omitted). *See also S.P.*, 47 A.3d at 830 (quotation marks and citation omitted) (stating that the length of a parent's remaining confinement "can be considered as highly relevant to whether the conditions and causes of the

incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent, sufficient to provide grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(2)." Thus, in **E.A.P.**, 944 A.2d at 85, this Court held that the mother's repeated incarcerations and lack of a relationship with the child supported termination under section 2511(a)(2), and the mother's compliance with various prison programs did not alter those facts.

Father asserts that his incarceration is not itself a sufficient basis for termination of parental rights. He claims that CYS failed to prove section 2511(a)(2) because the services relating to his permanency objections were not available in prison, he used all possible resources to maintain a relationship with Child, and CYS did not assist him in contacts with Child.

The Orphans' Court concluded that Father's incarceration prevented him from providing essential parental care for Child's physical or mental well-being and from providing adequate and safe housing for Child, warranting the termination of his parental rights under section 2511(a)(2). **See** Orphans' Court Opinion, 11/15/22, at 7. The court found that Father's minimum release date is June 22, 2023, and his maximum release date is December 22, 2025, at which time Child will be nineteen and one-half years old. **See id**. at 6; **see also** N.T., 6/9/22, at 24, 30 (Father's testimony regarding his minimum and maximum term of incarceration). The court found there was "no evidence or witnesses presented by Father to indicate that Father will be released" on his minimum date. **See** Orphans' Court Opinion, 11/15/22, at 7. The court

- 10 -

concluded that Child's right to have proper parenting in a permanent, healthy, and safe environment outweighed Father's interest. **See id**. at 11.

We discern no error of law or abuse of discretion in the Orphans' Court's finding that Father's incarceration, and the consequences of that incarceration, supported termination pursuant to section 2511(a)(2). Father did not have contact with Child until Child's relocation to Pennsylvania in 2018. Even then, Father did not care for Child for more than four months. He acknowledged that he "was running from parole, so [he] couldn't keep [Child] then." N.T., 6/9/22, at 24. The evidence shows that during that time Father did not attend to Child's truancy issues and did not secure medical attention for Child's scoliosis. **See id**. at 10, 19. Additionally, Father may not be released from prison until December 2025, when Child will be nineteen and one-half years old. The length of Father's remaining confinement establishes that his incapacity due to incarceration cannot or will not be remedied prior to Child reaching majority. Thus, we affirm the decree under Section 2511(a)(2). **See S.P.**, 47 A.3d at 831; **K.M.W.**, 238 A.3d at 474. In light of this conclusion, Father's remaining contentions are irrelevant.

Father's second issue implicates the best interest of Child. The Supreme Court has recently re-emphasized that pursuant to section 2511(b) courts "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. . .. This of course requires the court to focus on the child and consider all three categories of need and welfare."

*Interest of K.T.*, --- A.3d ---, ---, 2023 WL 4092986 at *11 (Pa., filed June 21, 2023). *K.T.* specifically directs courts "to consider the matter ***from the child's perspective***, placing her developmental, physical, and emotional welfare ***above concerns for the parent***." *Id*. (citation omitted; emphasis added). The child's emotional needs and welfare include intangibles, such as love, comfort, security, and stability. *See T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Although any bond a child has with her biological parent is of significance, the court must weigh that bond, which is potentially unhealthy, against the damage that bond may cause if left intact. *See In re T.S.M.*, 71 A.3d at 269. The child's bond with parents, though a major aspect of a subsection (b) analysis, is "nonetheless only one of many factors to be considered by the court . . . ." *K.T.*, --- A.3d at ---, 2023 WL 4092986 at *16 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).

Courts considering an involuntary termination petition "must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years and we have an obligation to see to their healthy development ***quickly***." *K.T.*, --- A.3d ---, ---, 2023 WL 4092986 at *15 (citation omitted; original emphasis) (also noting that *T.S.M.* advised courts to move toward an alternative permanent home when it is clear the parent will be unable to provide for the child's basic needs in the near future, so as not to impair the bond with pre-adoptive parents).

When it considers the parental bond, the court must examine whether termination of parental rights "will destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences". **K.T.**, --- A.3d at ---, 2023 WL 4092986 at *16 (quotation marks and citation omitted). That focus enables a court to properly prioritize the child's needs:

> [B]y evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

**Id**. The subsection (b) inquiry must consider not only the parental bond, if any, but also the child's need for permanency, the length of time in foster care, whether the child is in a foster home and bonded with foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible ones. **See K.T.**, --- A.3d at ---, 2023 WL 4092986 at *18.

With respect to section 2511(b), Father argues that the evidence was insufficient to demonstrate that termination of his parental rights would serve Child's needs and welfare. Specifically, he asserts that CYS "did not exercise reasonable efforts to foster the relationship between" him and Child. Father's Brief at 19. Father claims that Child visited him in prison at an unspecified time before he was transferred, CYS made no effort to foster his contact with her for one year after his prison transfer, Child wants to maintain contact with

him, he and Child have a strong and loving bond, and it would be detrimental to separate them.

The Orphans' Court found that foster mother meets Child's physical, developmental, and emotional needs, and that termination would best serve Child's needs and welfare. The court based its decision on: (1) testimony that Child wanted permanency in her life and to be part of a family, things Father could not provide her; (2) foster mother's continuing efforts devoted to meeting Child's educational, mental health, and emotional needs; (3) Child's informed preference for adoption by foster mother, with whom she has a parent/child bond; (4) Child's unwillingness to speak to Father, who she feels abandoned her; (5) the absence of a parent-child bond between Child and Father; and (6) testimony that Child would not suffer any detrimental impact from the termination of Father's parental rights. **See** Orphans' Court Opinion, 11/15/22, at 13-17.

We perceive no error in the Orphans' Court's ruling. Child chose not to have contact with Father and repeatedly said so to the CYS caseworker, became hysterical after speaking with him, struggles with her feelings of abandonment, and has refused to have family counseling with Father. **See** N.T., 5/2/22, at 13-14, 20, 22; N.T. 6/9/22, at 42, 47-48. Child, who was nearly sixteen years old at the time of the hearings, testified that she wants to be adopted to become part of a family with foster mother, with whom she had been for ten months, even while she retains contact with Father. **See**

N.T., 5/2/22, 13-15; N.T., 6/9/22, at 38, 52-53. Additionally, Hartman testified that termination would be beneficial for Child: it would relieve her of any guilt, stressors, and struggles with her parents, and give her separation, allowing her to choose her own future. *See* N.T., 6/9/22, at 38.[5]

The evidence amply supports the Orphans' Court's conclusion that terminating Father's parental rights will serve Child's developmental, physical, and emotional needs and welfare pursuant to section 2511(b). Accordingly, we affirm the decree involuntarily terminating Father's parental rights.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/17/2023

---

[5] Father's assertion that CYS did not properly support his relationship with Child finds no support in the law. In *In the Interest of D.C.D.*, 105 A.3d 662 (Pa. 2014), our Supreme Court held that, with respect to section 2511 of the Adoption Act, "Neither subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *Id.* at 672.