J-S34032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.L.D., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: O.L.E., FATHER | : : : : : : | |
| | : | No. 329 WDA 2023 |

Appeal from the Order Entered February 9, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No. 063 of 2022

BEFORE:  LAZARUS, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                **FILED: October 20, 2023**

O.L.E. (Father) appeals from the order granting the petition of the Westmoreland County Children's Bureau (WCCB) and terminating Father's parental rights to J.L.D. (Child).[1]  We affirm.

Child was born in March 2009.  Father lived with Child and Mother in Pennsylvania for seven months, from 2018 to 2019.  N.T., 2/2/23, at 73; Mother's Brief at 5.  Father had moved to Pennsylvania from South Carolina.

---

[1] Child's mother, T.L.D. (Mother), voluntarily relinquished her parental rights.  **See** Orphans' Court Opinion, 5/24/23, at 1-2.  Mother "indicated through her counsel that she intended to consent to Child being placed for adoption," and executed her consent to termination on June 15, 2022.  **See id.** at 1; N.T., 2/2/23, at 8.

***Id.*** In March 2019, Father moved back to South Carolina, where he continues

to reside.[2]  N.T., 2/2/23, at 73-74.

> A little more than a year later, the WCCB sought

> emergency custody of the Child and her siblings in early June 2020, after Mother indicated to the WCCB that she was unable to provide appropriate care for the physical wellbeing of the children, was facing mental health issues, and had recently been charged criminally with possession of drug paraphernalia.  The Order of Adjudication, dated July 21, 2020, indicated that Father resided in South Carolina, worked two jobs and did not have housing suitable for the Child.  At the time of disposition of the dependency matter, Father indicated that he wished to have custody of the Child, but that he was working approximately more than 12 hours per day at two different jobs and was renting a single room in a mobile home from another couple who already had children living in the home.  Father acknowledged as early as October 2, 2020, that he needed to rectify his housing situation in order to obtain custody of the Child.  Father's housing situation remained unchanged during the Permanency Review Hearings on March 3, 2021, October 26, 2021, April 11, 2022, and October 3, 2022.  The WCCB petitioned for involuntary termination on August 31, 2022, and a hearing was set for November 16, 2022.  At that time, Father indicated that he wished to contest the petition, and a full hearing was scheduled for February 2, 2023.

Orphans' Court Opinion, 5/24/23, at 3.

---

[2] Father testified he found Mother "with another man … and I was thrown out of the house.  I had nowhere to go, so I had to move back to South Carolina." N.T., 2/2/23, at 85.

- 2 -

<u>February 2, 2023 Termination Hearing</u>

At the termination hearing, Stephen Crevak represented Father, who participated by telephone from South Carolina. N.T., 2/2/23, at 13, 33-34. Attorney Dorean Petonic represented Child's best and legal interests.[3]

*WCCB Caseworker*

WCCB caseworker Jeffrey Knox testified to working with the family since July 16, 2020. N.T., 2/2/23, at 7. Mr. Knox stated that he sent Father the family service plans, and called Father to discuss "what they entailed." ***Id.*** at 35. Mr. Knox identified lack of "stable housing" as Father's greatest parenting impediment. ***Id.*** at 42. According to Mr. Knox, Father had at least three residences in the past three years. ***Id.*** at 51. He described Father as currently "living with roommates," which would require Child to share a room with Father "if she was to move in with him." ***Id.*** at 38.

As to Child, Mr. Knox stated that Father and Child had "communicated by phone and video" in the past, but their communication ceased around April 2022, when Child "indicated she did not want to speak" with Father. ***Id.*** at 36-37.

---

[3] Attorney Petonic "placed into the record … that Child's legal and best interests were not such that [Attorney Petonic] would be conflicted in representing them to the [orphans' c]ourt." Orphans' Court Opinion, 5/24/23, at 1; ***see also*** N.T., 2/2/23, at 6.

At the time of the hearing, Child had been in WCCB's custody for 32 months. *Id.* at 8, 34. Mr. Knox relayed that Child was in "stable kinship placement [with her aunt and uncle] … in the state of Maryland." *Id.* at 46. Mr. Knox testified:

> [Child] is doing very well. Actually, she's thriving. Her grades have improved. She's engaged in therapy. She's attending school regularly, [and participating in] extracurricular activities. She started playing basketball. She's adjusted well since her move [to kinship care approximately 13 months prior]. She's able to speak to her aunt and uncle[, who are her foster parents,] and therapist about … what's going on.
>
> ….
>
> [Child] sounds happier. She's willing to tell me what she's doing. She presents and reports to me, as well as the Maryland caseworker, that she is bonded to her aunt and uncle.

*Id.* at 47-48.

Mr. Knox reiterated that Child "doesn't want to talk to [Father] at this time." *Id.* at 49. He explained:

> [T]hey argued at one point. They're upset about things. [Child] wrote a therapeutic letter to herself about her needs. The aunt had given it to [Father]. They kind of fought over it because [Child] wanted to be adopted in th[e letter] and wants to move on and have this finished.

*Id.*

*Father*

Father testified that he has lived in South Carolina since March 2019. *Id.* at 73. According to Father, after he returned to South Carolina, Child's Mother "moved somewhere else," and he "wasn't able to get in contact with

- 4 -

[M]other." *Id.* at 74. Consequently, Father lost contact with Child from March 2019 until June 2020, when WCCB obtained custody of Child. *Id.* Father stated he "did not have the full understanding of what conditions [Child] was living in" with Mother. *Id.* at 75. Father testified he "immediately contacted [Child's] grandmother, and [Mother's] sister answered the call and told [Father that Child] would live with them …." *Id.* at 74. Father stated that he got Child a phone "when she landed in foster care." *Id.* at 75. When counsel for the WCCB asked Father about Child not wanting contact with him, Father replied, "Yes. I am aware of that." *Id.* Father expressed, "I need to talk to [Child] and spend more time with her, if I'm allowed to by others." *Id.* at 76.

Father confirmed that he participated remotely in the permanency review hearings. *Id.* at 77. He testified that he did not visit Child when she was in foster care because his job denied him time off. *Id.* at 78. Father also testified to previously working long days, from 7:00 a.m. to 10:00 p.m., as a laborer and at a restaurant. *Id.* at 67. Although he got two days off, it was not enough time "to drive from South Carolina to Pennsylvania and back." *Id.* at 79. Father stated he "needed at least one more extra day, and my job denied me the days off." *Id.*

Father subsequently obtained a better paying "tree job." *Id.* at 80. On July 1, 2022, Father was seriously injured by a falling tree. *Id.* at 70, 80. Father's work injury included broken bones in his neck and spine. *Id.* at 70. Father testified that as a result of the injury, he "was stuck in bed for two

months [and] couldn't do anything for two months." *Id.* at 81. Father also lost his car. *Id.* at 84. Father currently works at a gas station. *Id.* at 70, 81.

Father acknowledged that throughout the case, the WCCB has advised him about the inadequacy of his housing. *Id.* at 68. Father testified to living at the same address for a year. *Id.* at 65. He explained:

> Where I am right now is a two-bedroom. I rent the room [from] a female friend of mine and her son, who is 13 years old. She has a room with her kid. I have my own room.

*Id.* at 69. Father confirmed he does not have room for Child. *Id.* at 77. He stated he did not have appropriate housing for Child "at the moment," and was "working on that." *Id.* at 84.

Father also confirmed he last communicated with Child in April 2022. *Id.* at 71. From June 2020 to April 2022, Father spoke with Child every "two or three days," and "anytime she needed to contact me, she could call." *Id.* at 71-72. Father stated he "just want[s] to talk to [Child] again." *Id.* at 72. In response to questions from Attorney Petonic, who represented Child's best and legal interests, Father testified that Child's foster mother keeps him informed. *Id.* at 84. Father stated:

> I'm aware [Child] is playing basketball. Her foster mother sent me a video of her playing basketball. [Foster mother] has great communication with me about her doing well and how she's doing in school and that she's doing really well and that she's going to therapy.

*Id.*

- 6 -

*Child's Attorney*

Attorney Petonic stated that Child "is in a very good place" with her "kinship foster family." **Id.** at 141. She opined, "it is certainly in [Child's] best interest to remain [with the kinship family] and to be adopted." **Id.** Attorney Petonic explained:

> [Child] very much wants to be adopted and wants her legal parents to be [her aunt and uncle, who] she now calls mom and dad. …
>
> This family has promoted the relationships [between Child, her siblings] and [M]other. They have followed all the requirements of the agency. [Child] is secure. [Child's] mental health needs are being met. … [Child] takes part in activities outside of school. … That's where [Child] wants to remain.
>
> I certainly believe it's in [Child's] best interest.

**Id.** at 141-42.

The orphans' court concluded the WCCB presented "sufficient evidence to justify termination of Father's parental rights under Section 2511(a)(1), (2) and (8) of the Adoption Act. Additionally, the [c]ourt found that termination would serve the best interest of the Child under Section 2511(b)." Orphans' Court Opinion, 5/24/23, at 7. The orphans' court terminated Father's parental rights on February 9, 2023. Father timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father presents the following questions for review:

1. Was clear and convincing evidence presented to show that termination was warranted pursuant to 23 Pa.C.S.A. Sections 2511(a)(1), 2511(a)(2), 2511(a)(8), and § 2511(b)?

2. Did the trial court err in terminating Father's parental rights despite evidence Father made efforts towards reunification to the best of his abilities, considering his situation and circumstances?

Father's Brief at 4.

Father combines his two issues in one argument. *See id.* at 8-13; *see also* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued"). Father claims "the record clearly reflects the [WCCB] failed to satisfy the required burden of proof to establish the legal grounds to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), § 2511(a)(2), § 2511(a)(8), and § 2511(b)." Father's Brief at 7.

Discussion

We review the termination of parental rights for an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

> [O]ur standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review .... [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a

cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Id.* at 826-27 (some citations omitted). The petitioner has the burden to provide clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Termination of parental rights is subject to Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Under Section 2511, the orphans' court must engage in a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted).

Father argues the WCCB "provided insufficient testimony and evidence" and improperly terminated Father's parental rights "solely on the basis of his housing situation." Father's Brief at 10.

- 9 -

The WCCB argues otherwise, stating that it "satisfied the evidentiary requirements" and presented clear and convincing evidence of grounds for termination which would best serve Child's needs and welfare. WCCB's Brief at 9. The WCCB states Father "had not acted in a parental role," and "made little to no progress in remedying" his failure to parent Child. *Id.* at 11. Child's guardian *ad litem*/attorney and Mother agree with the WCCB. *See, e.g.*, Guardian *Ad Litem*'s Brief at 6; Mother's Brief at 7.

<u>Section 2511(a) - Grounds for Termination</u>

To affirm the termination of parental rights, this Court need only agree with the orphans' court's decision as to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We examine Father's challenge under Subsection 2511(a)(2), which provides for termination when

> [t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). The petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination "are not

- 10 -

limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (emphasis added).

Here, the orphans' court explained:

Throughout the history of the dependency case, Father has consistently maintained contact with the Child through texting and phone calls, but he has never taken steps toward addressing his inadequate housing nor taken any steps toward growing his relationship with the Child by relocating somewhere closer to Pennsylvania.

Additionally, Mr. Jeffrey Knox, caseworker for the WCCB, testified that, in order for more specific recommendations regarding the fitness and appropriateness of Father in terms of reunification, Father would need to first demonstrate that he was able to obtain adequate housing. Once such housing was in place, a county agency in South Carolina would be able to assess Father's fitness for reunification. By keeping Father informed of the status of the dependency case and informing Father of the initial issues that needed to be resolved before an assessment for reunification could be achieved, the Agency did use reasonable efforts toward reunification.

Orphans' Court Opinion, 5/24/23, at 7.

The court further found:

In examining the facts … Father has failed to perform parental duties for at least six months. During the entirety of the Child's placement in foster care and kinship care, Father has never completed an in-person visit. Father has never taken steps toward addressing his deficient housing situation, which was a necessary first step toward obtaining an evaluation by his local county agency for appropriateness to reunify with the Child. … [T]he record reflects that **these same conditions have continued to exist since the inception of the dependency case and will not be remedied in a timely fashion**, as housing conditions were consistently identified as the barrier to reunification with Father. Lastly, the Child has been in custody of the WCCB for 32 months as of the time of the termination hearing, with the same circumstances preventing the Child from returning

to Father's care.

*Id.* at 4-5 (emphasis added).

We discern no error or abuse discretion, as the record supports termination under Section 2511(a)(2). This Court has recognized that a Child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Because the evidence supports termination under Section 2511(a), we next examine Child's needs and welfare pursuant to Section 2511(b). *In re L.M.*, 923 A.2d at 511.

<u>Section 2511(b) - Needs and Welfare</u>

When the court finds grounds for termination under Subsection 2511(a), it must then consider Child's needs and welfare:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. ...

23 Pa.C.S.A. § 2511(b). "The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" *Int. of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023).

This Court has stated repeatedly that intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare

of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The Pennsylvania Supreme Court recently stated,

> courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent. *See C.M.*, 255 A.3d [343,] 358 [(Pa. 2021)] ("A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights. [However, t]he time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support.") (citations omitted); *In re H.S.W.C.-B*, 575 Pa. 473, 836 A.2d 908, 911 (2003) (In termination proceedings and appeals, "the best interest of the children is always paramount[.]"). *Cf. In re R.I.S.*, 614 Pa. 275, 36 A.3d 567, 579 (2011) (plurality opinion) (Baer, J., concurring) ("It is incumbent upon the judicial system to be child-focused. Regardless of the heartbreak to a parent, children are entitled to every opportunity for a successful life, and a permanent, loving parental relationship greatly fosters that opportunity.").

*Int. of K.T.*, 296 A.3d at 1105.

Father references his history of communicating with Child and claims the WCCB's evidence was insufficient to demonstrate that termination was in Child's best interest. Father's Brief at 12-13. Again, the WCCB, Child's guardian *ad litem*/attorney, and Mother disagree. *See* WCCB's Brief at 13-15; Guardian *Ad Litem*'s Brief at 8; Mother's Brief at 11-14.

Our review reveals no error or abuse of discretion by the orphans' court's consideration of Child's needs and welfare. At this writing, Child is 14 years old. There is no evidence Father has parented Child, who has expressed her

desire to remain in pre-adoptive placement with her aunt and uncle. The orphans' court summarized:

> The Child is placed in a kinship foster home in the State of Maryland and is reportedly thriving, participating in extracurricular activities, doing well in school, and addressing mental health concerns in the foster home. The foster family has indicated that they are a pre-adoptive resource, which provides the Child with stability on the horizon.

Orphans' Court Opinion, 5/24/23, at 5.

Consistent with the foregoing evidence and law, the orphans' court properly considered Child's needs and welfare pursuant to Section 2511(b). As the court did not err, we affirm the termination of Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/20/2023