J-A11011-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.T.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.T.W.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1680 MDA 2024 |

Appeal from the Decree Entered October 10, 2024
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9489

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:          **FILED: APRIL 21, 2025**

M.T.W.B. (Father) appeals from the decree granting the petition to involuntarily terminate his parental rights (TPR petition) to L.T.R. (a son born in November 2015) (Child), which was filed by L.R. (Mother) and her husband, D.R. (Stepfather) (collectively, Petitioners), and terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).  After careful review, we affirm the decree.

This case returns to us following our remand for Petitioners to effectuate adequate notice to Father of Petitioners' TPR petition and any subsequent TPR proceedings.  ***See Interest of L.T.R.***, 317 A.3d 614 (Pa. Super. 2024)

_____

[*] Former Justice specially assigned to the Superior Court.

(unpublished memorandum at 11-12). We previously summarized the underlying procedural history:

> On March 30, 2023, Petitioners filed a petition to involuntarily terminate Father's parental rights to Child, as well as a petition for Stepfather's adoption of Child. Petitioners also filed notice of a termination hearing for July 26, 2023. The petition and notice included no certificates of service. Father filed no response, and no attorney entered an appearance on Father's behalf.
>
> On November 15, 2023, the trial court conducted a hearing on the [TPR] petition. … Father did not participate in the hearing. At the hearing, Mother and Stepfather testified. Additionally, Marsha Ann Basco, Esquire, appeared as guardian *ad litem* [(GAL)] and legal counsel for Child, but offered no testimony. At the conclusion of the hearing, the trial court granted the petition and involuntarily terminated Father's parental rights to Child. The court entered its termination decree on November 16, 2023.

*Id.* (unpublished memorandum at 1-2) (footnote and record citation omitted).

Father filed a timely appeal, arguing, *inter alia*, that the trial court "committed an error of law in permitting the [TPR hearing] to proceed where Petitioners failed to demonstrate appropriate and/or actual service of [n]otice of said [h]earing upon [Father.]" *Id.* (unpublished memorandum at 3). We agreed, vacated the decree, and remanded "for further proceedings, following appropriate notice to Father." *Id.* (unpublished memorandum at 12).

Upon remand, the trial court scheduled a new TPR hearing, which, after several continuances, proceeded to a contested hearing on August 1, 2024.

Father appeared, represented by counsel.[1]  Child did not appear, but was represented by the GAL, who indicated no conflict existed between Child's legal interests and best interests.  N.T., 8/1/24, at 4-5.  The trial court heard testimony from Petitioners and Father; the parties called no additional witnesses.

Mother testified that she and Father were in a romantic relationship for eight years, during which time Father subjected Mother to emotional and physical abuse.  *Id.* at 13.  Mother explained that she and Father separated shortly after Child's birth, and Mother filed for divorce when Child was approximately one year old, in 2016.  *Id.* at 13-14.  According to Mother, in 2018, a custody order (the custody order) was filed[2] granting Mother primary physical custody, and Father partial physical custody of Child.  *Id.* at 15 (Mother testifying that Father had custody of Child "one day during the week overnight[,] and then on the weekends.").

_____

[1] Father has been incarcerated since 2019.  The trial court's July 17, 2024, order directed that Father be transported from the State Correctional Institution at Phoenix to the Luzerne County Courthouse.  Order, 7/17/24. Father was physically present at the TPR hearing.

[2] No witness at the TPR hearing described the proceedings resulting in entry of the custody order, and, despite the trial court admitting the custody order into evidence, it is not included in the certified record.

According to Mother, in April 2018, she sought, and was granted, a protection from abuse (PFA)[3] order against Father. *Id.* at 15-16. Mother testified that the PFA order initially precluded Father from contacting Mother or Child, but was modified to permit Father supervised visitation with Child. *Id.* at 17. Mother claimed that after one month, Father violated the PFA order. *Id.*; *see id.* (Mother testifying that, as a sanction, Father "ended up on probation, and my PFA [order] got extended to a year."). Mother testified that, on an unspecified date, Father moved away from the area, and the custody arrangement changed to permit Father custody of Child "every other weekend from Friday afternoon to … Monday." *Id.* at 18-19.

Mother testified that in 2019, just after Child had turned four years old, Father was arrested. *Id.* at 19, 26.[4] Mother testified that in December 2019, she sought, and was granted, emergency relief giving Mother sole legal and physical custody of Child. *Id.* at 36-37. According to Mother, Father had no contact with Child since 2019. *Id.* at 29-30. Mother testified that in 2021,

---

[3] *See* 23 Pa.C.S.A. §§ 6101-6122.

[4] The trial court sustained Father's hearsay objections to Mother's attempts to testify to the criminal offenses with which Father was charged, and Mother did not produce a docket sheet for Father's criminal case. *See* N.T., 8/1/24, at 21, 22, 24. On cross-examination, however, Mother testified, without objection, that Father "tried killing people." *Id.* at 39. Further, as outlined below, Father confirmed that he is incarcerated pursuant to a sentence of 20 to 40 years in prison. *Id.* at 98.

she filed a petition to change Child's surname from Father's to Stepfather's,[5] which was granted. *Id.* at 12.

Mother explained that she and Stepfather have been in a romantic relationship since 2017, and they were married in 2020. *Id.* at 110. Mother and Stepfather have two biological daughters (a three-year-old and a one-year-old) with whom Child has "a great relationship." *Id.* at 108; *see also id.* at 108-09 (Mother testifying that "in the past month our youngest now cannot go to bed without l[]ying next to [Child] to go to sleep.").

Regarding Stepfather's relationship with Child, Mother testified as follows:

> [Stepfather] plays the role of dad. [Stepfather] came into [Child's] life when [Child] was a year[-]and[-]a[-]half[ old]. [Stepfather] was a huge influence on [Child]. [Stepfather] helps put [Child] to bed. [Stepfather] would help make dinner. [Stepfather] provides for [Child]. [Stepfather] helps pay half the bills. Before we were married, we split the bills in half. [Stepfather] treated [Child] like his own.

*Id.* at 110; *see also id.* at 112, 113 (Mother testifying that Stepfather 1) escorts Child to the school bus in the mornings; 2) helps Child with his homework; 3) attends parent-teacher conferences; and 4) takes the family on vacations); *id.* at 114 (Mother opining that Child views Stepfather as "his dad.").

---

[5] Stepfather is a preadoptive resource. N.T., 8/1/24, at 131.

Concerning Child's bond with Father, Mother confirmed that Father 1) has never taken Child to school; 2) has not prepared Child a meal since Child was three years old; and 3) does not attend to Child's day-to-day needs. *Id.* at 115-16. Mother opined that reestablishing a relationship with Father would be detrimental to Child, and that termination of Father's parental rights would be in Child's best interests. *Id.* at 116, 120, 121-22.

Stepfather testified that Father has not contacted Child since 2019, and that Child never asks about Father. *Id.* at 65, 133; *see also id.* at 133 (Stepfather testifying that Child "doesn't even think anybody disappeared. [Child] has never brought [Father] up once to me.").

Regarding his relationship with Child, Stepfather testified that he is

> the one that cares for [Child], takes [Child] places. I do things with [Child]. I'm constantly outside [with Child] in the pool. … Now that [Child's] of school age, I make him breakfast in the morning. [Child's] with me primarily mornings that I work because I do go in[to] work a little later. Then I take [Child] and his [half siblings] down to [Child's maternal grandparents'] house. Just anything [Child] really needs, he is not afraid to come to me and ask.

*Id.* at 126 (paragraph breaks omitted); *see also id.* at 129-30 (Stepfather testifying that Stepfather's siblings and parents view Child as a part of their family).

Father testified that he believes he would be incarcerated for the next 40 years. *Id.* at 73; *see also id.* at 98-99 (Father confirming that he was sentenced to 20 to 40 years in prison, and that he would not be eligible for parole for another 16 years from the date of the TPR hearing). According to

- 6 -

Father, prior to his incarceration, he and Child had a positive relationship. *Id.* at 73 (Father testifying that, prior to November 2019, Father "dedicated all of my time [to Child]. We're best friends. We did everything together. We went on trips and [did] many things …."). At the time of the TPR hearing, however, Father admitted that his relationship with Child "doesn't exist." *Id.* at 77. Father claimed Mother's efforts to prevent contact between Father and Child was the reason he no longer had a relationship with Child. *Id.* at 77-78. Father testified that in June 2024, he filed a petition for modification of the custody order precluding Father from contacting Child. *Id.* at 78.

At the conclusion of the TPR hearing, the trial court directed Petitioners and Father to file proposed findings of fact and conclusions of law,[6] and the GAL to provide a recommendation concerning whether Father's parental rights should be involuntarily terminated. *Id.* at 136. The GAL filed her written recommendation on September 30, 2024, opining, in pertinent part, as follows:

> It is clear that … Father has done nothing to resurrect, save, or improve his relationship with [Child]. In Father's own words, [Father's] relationship [with Child] is non-existent. Even with an eye on the difficulties with communicating from [prison], it is clear that no steps were taken by Father, after his [criminal] trial, until the [TPR petition] was filed. Although the situation may break Father's heart, [Child's] family and life has been with his Mother, Stepfather and siblings for almost his entire life. Father recognized the support he got from his family during the criminal

_____

[6] Petitioners and Father complied with the trial court's directive.

process, but no reason was provided as to why Father's family did not support him through his post-trial custody issues.

GAL Recommendation, 9/30/24, at 2 (unpaginated).

On October 10, 2024, the trial court entered a decree involuntarily terminating Father's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).[7] Father filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement. The trial court has also complied with Rule 1925.

Father raises the following issues:

1. Whether the trial court abused its discretion and/or committed an error of law in determining the parental rights of [Father] to [C]hild should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2)[?]

2. Whether the trial court abused its discretion and/or committed an error of law in determining the tenets of 23 Pa.C.S.A. § 2511(b) have been satisfied and the best interest of [C]hild [are] served by terminating the parental rights of [Father?]

Father's Brief at 4 (some capitalization modified; numbering added).

We review the termination of parental rights for an abuse of discretion. *See In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has

_____

[7] The October 10, 2024, decree did not address Petitioners' claim that termination of Father's parental rights was additionally warranted under 23 Pa.C.S.A. § 2511(a)(1).

been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)); *see also In re Adoption of C.P.D.*, 3245 A.3d 11, 24 (Pa. Super. 2024) ("[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." (citation and brackets omitted)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of

the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citation omitted). Finally, this Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

In his first issue, Father challenges termination of his parental rights under Section 2511(a)(2), *see* Father's Brief at 7-15, which provides:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

In his brief, Father faults the trial court for, in his estimation, relying solely on Father's incarceration as the basis for terminating Father's parental rights. Father's Brief at 9. Father further argues that, notwithstanding Petitioners' "ceaseless efforts to eradicate [Father's] relationship with [Child], [Father] has been proactive, despite his limitations, in attempting to preserve that bond." *Id.* at 13. Father maintains that he utilized the "opportunities [that are] available in prison to make sincere efforts to maintain a place of importance in the li[fe] of his … [C]hild[.]" *Id.* at 14 (quoting *In re R.I.S.*, 36 A.3d 567, 574 (Pa. 2011) (plurality)).

To satisfy Section 2511(a)(2), a petitioner must establish "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). "Grounds for termination pursuant to section 2511(a)(2), however, are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Interest of Z.N.B.*, 327 A.3d 241, 249 (Pa. Super. 2024) (quotation marks and citation omitted).

Significantly, concerning incarcerated parents facing the involuntary termination of parental rights, we have

> "long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental

- 11 -

responsibilities." *Int. of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) [(*en banc*)]. Furthermore, "**incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2)**, where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care." *In re Adoption of S.P.*, 47 A.3d at 828. Pertinently, "**the length of the remaining confinement can be considered as highly relevant.**" *Id.* at 830.

> We are also cognizant that "each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind … that the child's need for consistent parental care and stability cannot be put aside or put on hold." *Int. of K.M.W.*, 238 A.3d at 474.

*Interest of R.H.B.*, 327 A.3d 1251, 1270 (Pa. Super. 2024) (brackets omitted; emphasis added).

Instantly, the trial court explained its reasoning for terminating Father's parental rights under Section 2511(a)(2):

> Father … confirmed that from the date of the hearing on August 1, 2024, he would be incarcerated[,] at the minimum[, for] sixteen (16) years since he already served four (4) years[ in prison]. Father agreed that by the time he would be eligible for parole, [C]hild would be twenty-four (24) years old. [N.T., 8/1/24,] at 99. Father confirmed that he could not take [Child] to school for the next ten (10) years. [Father] would not be able to feed [Child], bathe him, nor clothe him due to [Father's] incarceration. *Id.* at 99-100.
>
> This [c]ourt recognizes that in the event Father is released after serving his minimum date of twenty (20) years, [C]hild would no longer be a child. Father's lengthy incarceration precludes him from being able to provide the essential parental care for the physical and mental well-being for [C]hild in the present and in the future.
>
> ….

> In this case, Father is an incarcerated parent whose minimum date of release would be 2039. … In the event Father is released at the maximum date of 2059, [C]hild would be an adult at the age of forty-four (44) years. Simply put, Father cannot be a parent to [C]hild while he is incarcerated for either period of time.
>
> Accordingly, Father's parental rights to [C]hild [] can be terminated under Section 2511(a)(2) …. Credible testimony at the [TPR] hearing was presented to show by clear and convincing evidence that Father is incapable of presently providing a safe and healthy living environment for [C]hild.

Trial Court Opinion, 1/13/25, at 10-11.

The trial court's factual findings are supported by the record, and its conclusion is free of legal error. **See Interest of K.T.**, 324 A.3d at 56. Our review confirms that Father has not had any contact with Child since 2019, and has made no effort to carry out any parental duties. N.T., 8/1/24, at 29-30, 65.[8] The record discloses that, since 2019, Father has failed to "utilize all available resources to preserve the parental relationship" with Child. **Int. of K.M.W.**, 238 A.3d 465, 474 (Pa. Super. 2020); **see also** N.T., 8/1/24, at 86-87 (Father testifying that, since 2019, he had only once attempted to provide Child with any gifts, and would send letters or cards to Child "[a] few times a year; nothing persistent[,] but a few times a year."). Further, we cannot

---

[8] Father argues that the trial court should not have credited Petitioners' testimony that Father's brother (and not Father) provided a gift for Child in December 2019, and that Father did not send letters or cards to Child. **See** Father's Brief at 13. We decline Father's invitation to substitute our own credibility determinations for those of the trial court. **See In re Adoption of C.P.D.**, 3245 A.3d at 24 (stating the trial court "is the sole determiner of the credibility of witnesses").

ignore the fact that, should Father be paroled at his minimum sentence, Child will already be well into adulthood. *See In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014) (concluding that "family reunification [was] not a realistic goal," where father was incarcerated prior to child's birth, and would "remain incarcerated at a minimum until [c]hild is 7 years of age, and likely older.").

We have recognized that a child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006); *see also In re Adoption of B.G.S.*, 240 A.3d 658, 665 (Pa. Super. 2020) ("[A] parent does not perform his … parental duties by displaying a merely passive interest in the development of a child."). Accordingly, Father's challenge to termination of his parental rights to Child, under Section 2511(a)(2), is without merit.

Father next challenges termination under Section 2511(b). Father's Brief at 14. Father argues that Mother "stacked the deck" against him by 1) obtaining modification of the custody agreement to prohibit contact between Father and Child; and 2) "slapping away every overture made by [Father] and his family to maintain a bond with [Child] …." *Id.* at 15.

Petitioners counter that

Father has not participated in [C]hild's education or medical appointments. Father has not communicated by any means with [C]hild since 2019. Father claimed that he sent gifts, but could not identify what type, and letters to [C]hild[,] but did not produce

copies of any letters. Father had the phone numbers for [Petitioners,] but never placed a call to either of them since 2019.

Petitioners' Brief at 13-14 (record citations omitted).

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *K.T.*, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted); *see also In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) (stating that "courts must keep the ticking clock of childhood

ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly.").

Here, the trial court explained its termination under Section 2511(b):

[T]he [c]ourt notes that [GAL] for [C]hild recommended that it is in [C]hild's best interest to terminate the parental rights of Father as to [C]hild. [The GAL] further stated that Mother, Stepfather, [C]hild, and [Child's] two [half] sisters "are a complete family unit." [GAL Recommendation, 9/30/24, at 2.] [The GAL] additionally found that a bond between Stepfather and [C]hild is "readily apparent." [*Id.*]

This [c]ourt finds that Father's length of incarceration precluded him from remedying the conditions of effectively providing for [C]hild's essential physical and mental well-being. Therefore, the [c]ourt finds that Father has not been able to remedy the condition of his incapacity to provide parental care or control[,] which is necessary for [C]hild's well-being ….

The [c]ourt further finds that [C]hild's physical, developmental and emotional needs have been met by [Petitioners]. It is further evidence that the bond between [C]hild and [] Stepfather is a parent/child bond. [C]hild needs and deserves a paternal figure in life that will supply proper nurturing, love, guidance and security. Termination of the parental rights of Father is supported by clear and convincing evidence. It is further clear that [termination] is in the best interest of [C]hild.

Trial Court Opinion, 1/13/25, at 16-17.

We agree with the reasoning and determination of the trial court, which is supported by the record and free of legal error. *See Interest of K.T.*, 324 A.3d at 56. At the time of the TPR hearing, Father had no contact with Child for four years—half of Child's life. Conversely, Petitioners have diligently attended to all of Child's physical, developmental, and emotional needs. *See* N.T., 8/1/24, at 110-14, 126-30. The trial court acted within its discretion

when it credited Petitioners' testimony concerning Child's bond with Stepfather, and rejected Father's testimony concerning his efforts to maintain a bond with Child. *See L.C.J.W.*, 311 A.3d at 48 ("It is the province of the orphans' court to assess credibility and resolve any conflicts in the evidence, and in doing so it is free to believe all, part, or none of the evidence presented." (citation and quotation marks omitted)).  Accordingly, Father's final claim merits no relief.

Decree affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: 04/21/2025